The Law Office of James M. Branden
551 Fifth Avenue
New York, New York 10176
Tel. 212-286-0173
Fax 212-286-0495


August 30, 2021


Hon. Paul A. Crotty
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

                    Re:   United States v. Michael Paulsen
                          Cr. Docket No. 19-660 (PAC)

Dear Judge Paulsen:

     Along with Joseph V. Sorrentino, I represent Mr. Paulsen in
the above-referenced matter.  Sentencing is scheduled for September
9, 2021.


## STATEMENT OF THE CASE

Background

     Mr. Paulsen's father was an alcoholic and suffered from a
gambling addiction.  Though he had six children, he did not enjoy
fatherhood and left parenting to his successive wives.

     His parents separated in 1983, when Mr. Paulsen was five years
old.  His mother, Marie, was left alone to care for Mr. Paulsen and
his younger (full) sister, Jennifer.  Marie worked at low pay as a
secretary and later as a clerk in a store.  She and the kids lived
in a one-bedroom apartment in Brooklyn and scraped by with
additional money from Marie's father, welfare payments and food
stamps.  Marie died of ovarian cancer in 2011, at the age of 65.
Mr. Paulsen lived with her and cared for her throughout her
prolonged illness and until her death.

     Several of Mr. Paulsen's siblings have criminal records or
drug addiction issues.  For example, his half-brother Paul was
imprisoned in New York for four years for auto theft and five years

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 2

in Florida for robbing a jewelry store.  His half-brother Danny was
the "driver" in the Florida robbery and served three years'
imprisonment.  Paul has suffered from drug addiction for decades.
For approximately fifteen years, Jennifer was addicted to
prescription drugs and then heroin.  She now resides in a homeless
shelter.

Mr. Paulsen graduated high school in 1998.  In the last two
years of high school, he worked part time at Eisenberg Pharmacy,
making deliveries.  After high school and for a period of five or
six years, Mr. Paulsen had at least three employers.  He continued
to work for the Eisenberg Pharmacy and at the same time he worked
in sales and then sales management for Cellnet Communications.
Thereafter, he sold cell phones and cell phone packages from a
kiosk in a mall in New Jersey for SBS Cellular, a company owned by
a half-sister's husband.

From 2004 until 2015 when the company was sold, Mr. Paulsen
was employed by Regal Remedies Pharmacy in Brooklyn as a pharmacy
technician.  Following a nine-month course, he earned a pharmacy
technician license in 2007 from Kingsborough Community College.
Following the closure of the Brooklyn Regal Remedies Pharmacy, in
September 2015, Mr. Paulsen located a suitable property in Staten
Island and opened, as owner, Regal Remedies RX (RR RX).  His
activity there will be addressed below in the Offense Conduct
section.

For the past four to five years, Mr. Paulsen has been in a
committed relationship with Heather Cahill.  Ms. Cahill has a ten
year old daughter, ████████, whose father died of a heart attack
three years ago.  Since then, Mr. Paulsen has taken on a fatherly
role.  Heather described Mr. Paulsen as "loyal" and "trusting" and
an "amazing person."  She is concerned that his incarceration will
have a profoundly adverse affect on her daughter (PSR at ¶56).

The Offense Conduct

From March 2016 until August 2019, RR RX distributed a wide
range of prescription medication legally.  As to oxycodone, Mr.
Paulsen ordered 170,000 pills from suppliers signing the name of
the pharmacist on staff.  RR RX distributed slightly more than a
third of these pills legally.  Of the remainder, however, RR RX
dispensed them without a prescription or pursuant to a fraudulent
prescription and for cash.  Mr. Paulsen knew that at least some of

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 3

these customers planned to resell a portion of the pills "on the
street."  PSR at 6-7, ¶¶15-18.

### The Sentencing Guidelines

     RR RX distributed a total of 80,054 pills, 78,914 of the 30
milligram variety and 1,140 of the 80 milligram variety, for a
total of 2,458.62 grams.  Pursuant to the converted drug weight
table, 1 gram of oxycodone is the equivalent of 6.76 kilograms of
converted drug weight and 2,458.62 grams is therefore the
equivalent of 16,472.75 kilograms of converted drug weight,
resulting in a base offense level of 34.  PSR at 9, ¶30.

     The conversion rate for oxycodone has long been the subject of
criticism.  The defense adopts all the arguments in "Quantity
Dependent Sentencing Ranges, the Drug Equivalency Tale, and
"Oxycodone (actual)," by Michael J. Liston (attached as **Exhibit A**),
with the conclusion that the 1 gram to 6.7 kilograms "'equivalence'
is unreasonable and penalizes offenses involving oxycodone
differently from and more harshly than offenses involving the other
opiates."  In support of that conclusion, Liston noted:

          The oxycodone purity of the 10 mg OxyContin
          pills used in producing the 6.7 kilogram
          marijuana equivalence was 7.4%.  Average
          heroin "package" purity at street level
          quantities of 1 gram or less revealed in the
          Data Supplement 2013 Table 63 is over four
          times that amount.  In addition, heroin is a
          schedule I controlled substance without any
          acceptable medical use, is pharmacologically
          twice as potent as oxycodone, and, unlike
          prescription medications such as oxycodone,
          heroin "packages" are distinctly susceptible
          to hidden and deadly adulteration.  From any
          perspective, heroin is more dangerous than
          oxycodone.  Comparatively, however, guideline
          sentencing ranges for oxycodone offenses are
          more severe than guideline sentencing ranges
          for heroin offenses . . . . A sentence for an
          oxycodone offense that is based on a
          sentencing range so calculated can only be a
          reasonable sentence accidentally (footnotes
          omitted).

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 4

     In any event, two levels were added for abuse of a position of
public  or  private  trust,  and  two  levels  were  subtracted  for
compliance with the safety valve.  PSR at 9, ¶¶31, 33.  Last, three
levels were subtracted for timely acceptance of responsibility.
PSR at 10, ¶¶37, 38.  The total offense level is 31 and Mr. Paulsen
is in criminal history category I, for an advisory Guidelines range
of imprisonment of 108-135 months.

          Mr. Paulsen's Efforts to Cooperate

     Not long after his arrest, Mr. Paulsen met with the government
in a proffer session.  He met with the government again several
times thereafter.  At no time did the government believe that he
lied, misstated relevant or material facts or omitted such facts.
In the end, however, it was constrained to conclude that Mr.
Paulsen could not provide substantial assistance as the main person
he  spoke  of  had  already  been  under  investigation  and  he  was
insufficiently aware of other corrupt oxycodone or prescription
drug merchants.  In a sense, Mr. Paulsen's effort to mitigate the
harm by attempting to cooperate with the government worked to his
great disadvantage as the relatively elevated base offense level
stems not from the government's prior investigation of him but from
his estimates of oxycodone illegally dispensed as set forth in the
proffer sessions.

          Character Letters

     Attached hereto are letters from Mr. Paulsen, members of his
family, friends, and others evidencing Mr. Paulsen's core decency
(**Exhibit B**).  While I am certain the Court will read all of the
letters, I highlight a few of the expressed sentiments here.

     Mr. Paulsen reflected upon the "rough road" of his upbringing
and suggested that it may have contributed to his lack of judgment
in choosing the "easier path," to wit, the instant offense conduct.
He also explained that he is making efforts to atone and give back.
In the latter regard, he cares for and nurtures, ████████, the ten
year old daughter of his girlfriend, he volunteers at Meals on
Wheels and runs errands for an elderly acquaintance.

     In her letter, Lisaann Lobrutto-McGarity filled in more of the
sordid details of Mr. Paulsen's upbringing.  According to her, Mr.
Paulsen's father was a "con artist" who led "a double life with
another family in another state."  When he left, Marie was forced

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 5

to move into her parents two-bedroom apartment with Mr. Paulsen,
and Jennifer. Marie was traumatized. Marie's mother suffered from
severe rheumatoid arthritis and was bed-ridden. And, Marie's
father engaged in "questionable activity" on the streets.
Unfortunately, Marie's father became the dominant role model and
encouraged petty theft and lawlessness in Mr. Paulsen. Despite
this inauspicious environment, Mr. Paulsen managed to complete his
secondary schooling. When for a period Marie was unable to work,
Mr. Paulsen got a job at the neighborhood pharmacy as a delivery
boy, contributed to the rent and cared for her. When teenage
Jennifer had a baby, Mr. Paulsen cared for both of them as well.
According to Ms. Lobrutto-McGarity, "[Mr. Paulsen] was still a
child himself and the burden was great."

Mr. Paulsen's girlfriend, Heather Cahill, also wrote a letter.
She said that Mr. Paulsen is her "rock" to whom she turns in any
"situation or crisis." She added that her daughter, ███████,
"looks up to Michael like a Dad." She also spoke to Mr. Paulsen's
contrition as follows: "[H]e is ready to accept responsibility for
his actions. I believe as we move forward Michael will become a
better person. He has expressed a deep sense of remorse during
this time he has had to reflect on his actions, and has stated to
me numerous times that he is sorry and regretful for everything he
has done. I truly believe in his ability to pay his debt to
society."

Madeline McNerney grew up in the same neighborhood with Mr.
Paulsen. She noted that he was enormously helpful to his needy
mother and sister, and the latter's son. At bottom, she said, he
is a "kind, gentle man who puts others before himself. He is the
first to help anyone." Christine Lyons, another lifelong friend,
echoed these beliefs, stating that Mr. Paulsen was deeply
supportive and charitable and, as the saying goes, would "give a
stranger the shirt off his back."

Jared Gaccione provided a letter also. He did so to "bring to
your attention [Mr. Paulsen's] unrivaled commitment to his family,
especially his step-daughter[, ███████,]" which he described as
"nothing short of amazing."

Last is a letter from the Vice President of Meals on Wheels.
She noted that Mr. Paulsen began delivering meals for the elderly
and infirm in November 2020 at a critical time as without him and
other such volunteers during the Covid-19 pandemic the agency could

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 6

not have met the demand.

<u>Dr. Bardey's Psychiatric Evaluation</u>

For a better understanding of his personality traits, Mr. Paulsen submitted to a psychiatric evaluation by Dr. Alexander Bardey (**Exhibit C**). Before detailing Dr. Bardey's conclusions, it merits noting that Mr. Paulsen provided a more thorough review of his difficult, formative years under the care of his corrupt, domineering grandfather.

As set forth above, Mr. Paulsen's father walked out on the family when Mr. Paulsen was four or five years old.[1] Marie and the kids moved in with her parents. Mr. Paulsen's grandfather was abusive and slapped them all for minor slights and mistakes. Marie and the kids moved out after about 18 months but Mr. Paulsen's grandfather maintained a strong presence. When Mr. Paulsen was 12, his grandfather took him along when conducting his loan sharking business. He encouraged Mr. Paulsen to take on the "trade" so that he could provide for Marie. Mr. Paulsen had occasion to watch his grandfather assault deadbeats and heard him speak ill of family members who did not "hustle" like him. Mr. Paulsen assisted his grandfather for years fearing that he would be beaten if he refused. When Mr. Paulsen entered high school his grandfather regularly removed him so that the boy could steal groceries from the store. He gave Mr. Paulsen money when he succeeded. By 17, Mr. Paulsen collected loan payments from his grandfather's clients alone. The grandfather died a year later and Mr. Paulsen took over his business for a time. Given this poor guidance from home, it may not surprise that Mr. Paulsen had trouble in school, as well. He fell in with the wrong crowd and started smoking marijuana. He was, as noted, a regular truant. He was arrested for shoplifting. It took an extra six months for him to earn sufficient credits to graduate.

In any event, Dr. Bardey administered several tests and analyzed the results. It was his conclusion that Mr. Paulsen

---

[1]

According to Mr. Paulsen's half-brother, Vincent, their father was convicted of embezzling millions from the New York Stock Exchanged and imprisoned. Vincent's mother divorced him during the period of imprisonment and Marie met him "on the train home from Sing Sing." Ex. C at 10.

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 7

suffers from bipolar II disorder with mixed features as evidenced
by his recurring depressive and hypomanic mood episodes
interspersed with symptoms of mania and depression. Ex. C at 13.
He noted, "Mr. Paulsen's involvement in high risk activities, as
evidenced by the instant offense itself, is further indicative of
this disorder." Id. Dr. Bardey further concluded that Mr. Paulsen
also suffers from trauma and stressor-related disorder caused by
his "father's abandonment, being abused and controlled by his
grandfather, and his family's ongoing financial difficulties." Id.
at 14. As a result, he presently "experiences marked distress and
significant impairment in important areas of functioning." Id.
Stated another way, "Mr. Paulsen's chronic trauma altered his
development, causing the lifelong psychological problems that he
now manifests, which can best be described as antisocial
personality traits." Id. These traits, the doctor concluded,
contributed to the offense conduct. Id.

Dr. Bardey was careful to note that Mr. Paulsen's
"'antisocial' behaviors are a product of his repeated exposure to
role models who displayed antisocial behavior themselves, as well
as the threats of abuse he faced if he did not follow their lead.
As such, it represents a maladaptive response to trauma and learned
behavior rather than an ingrained personality type." Id. at 15.
It follows that, "Mr. Paulsen could learn to function in a more
prosocial manner with appropriate therapy and rehabilitation." Id.

## ARGUMENT

### MR. PAULSEN SHOULD BE SENTENCED WITH THE BENEFIT OF A SIGNIFICANT DOWNWARD VARIANCE

Pursuant to 18 U.S.C. §3553(a)(2), this Court is required to
"impose a sentence sufficient, but not greater than necessary" to
comply with generally recognized purposes of sentencing, including
the need:

> A)   to reflect the seriousness of the
>      offense, to promote respect for the law,
>      and to provide just punishment for the
>      offense;
>
> B)   to afford adequate deterrence to criminal
>      conduct;

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 8

        C)    to protect the public from further crimes
                of the defendant; and

        D)    to provide the defendant with needed
                education or vocational training, medical
                care, or other correctional treatment in
                the most effective manner.

Among other things, the sentencing court is also required to consider: the nature and circumstances of the offense, the history and characteristics of the defendant, and the applicable sentencing range as established by the now-advisory sentencing guidelines. 18 U.S.C. §§3553(a)(1), (a)(4).

A district court should begin all sentencing proceedings by calculating the applicable Guidelines range. _Gall_ v. _United States_, 552 U.S. 38, 49 (2007). The Guidelines provide the "starting point and the initial benchmark" for sentencing. _Id._ Here, the total offense level is 31 and Mr. Paulsen is in criminal history category I, for an advisory Guidelines range of imprisonment of 108-135 months. Of note, this flows from the very high base offense level of 34, which derives from the "equivalency" that 1 gram of oxycodone, a Schedule II drug, is 6.76 kilograms of converted drug weight. This equivalency standard was established by the Sentencing Commission to correct a disproportion in Guideline ranges resulting from the differing pill weights of two oxycodone medications – Percocets and OxyContins. In doing so, the Commission used the 10 mg OxyContin pill. Had it instead used the 20 mg pill, the equivalency weight would have been half that, or 3.35 kilograms of marijuana (Ex. A at 20). And, had it used the 40 mg pill, the equivalency weight would have been halved again, or 1.67 kilograms. The decision to use 10 mg was arbitrary.

Mr. Paulsen mostly dispensed 30 mg pills, but also some 80 mg pills. It seems more fair therefore to apply, for purposes of a variance, the 40 mg pill conversion rate that the Commission could have, just as easily, applied. Thus, the 2,458.62 grams illegally dispensed is the equivalent of 4,105.89 kilograms (2,458.62 x 1.67), which results in base offense level 32 (carrying a range of 3,000 to 10,000 kilograms). With that, Mr. Paulsen's total offense level would be 29 and the advisory range of imprisonment would be 87 to 108 months. Better yet, the Court could fairly apply the heroin equivalency weight (1 gram = 1 kilogram) given, as Mr. Liston compellingly argues (Ex. A at 22-23) that:

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 9

> heroin is a schedule I controlled substance without any acceptable medical use, is pharmacologically twice as potent as oxycodone, and, unlike prescription medications such as oxycodone, heroin "packages" are distinctly susceptible to hidden and deadly adulteration. From any perspective, heroin is more dangerous than oxycodone.

Applying the heroin/marijuana 1 gram to 1 kilogram ratio, Mr. Paulsen distributed 2,458.62 kilograms resulting in a base offense level of 30, and a total offense level of 27, with a corresponding Guidelines range of imprisonment of 70-87 months.

As to the nature of the offense, this was, to be sure, a serious offense. Nonetheless, when considered against the sprawling array of federal drug offenses that come before the Court, it was "garden-variety," undistinguished by the use of the usual tools of the trade, such as firearms, or violence of any kind, and, thankfully, there were no reports of serious illness or death to any of the users.

Setting this case still further apart from the heartland of drug offenses is Mr. Paulsen's history and character. At his core, Mr. Paulsen is and always has been caring, loyal and selfless. This can be seen in his utter devotion to his mother, his sister, her son, Ms. Cahill, and her daughter ███████, and his volunteerism. For these people and causes he has given of himself financially and emotionally.

Unfortunately, these values were all but stamped out by the circumstances of his youth. Mr. Paulsen's father left early for the apparent comforts of a hidden, second family, a fact that must have been all but incomprehensible for a caring, loyal and selfless child. Not surprisingly, Marie was emotionally traumatized by the abandonment and as a practical matter could not afford to raise the children on her own. She was constrained to move in with her parents despite the fact that they were terribly ill-suited to living with and caring for young children. Mr. Paulsen's grandmother was in ill-health and bed-ridden at the time and his grandfather was physically abusive to all members of the residence and a loan shark who groomed Mr. Paulsen for a life of crime. As noted above, in the earlier years, he kept Mr. Paulsen from school

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 10

to join him in debt-collection rounds, allowing Mr. Paulsen to watch as he assaulted the non-pays. Or, he sent Mr. Paulsen to the store to steal groceries for the family and paid him for any successful heists. Later, in high school, Mr. Paulsen was forced under the threat or fear of assault, to make the rounds alone on his grandfather's behalf. In keeping with this mis-education, Mr. Paulsen fell in with the wrong crowd in high school, experimented with drugs and attention to his studies waned. He was arrested for shop-lifting and when his grandfather died, Mr. Paulsen took over the collection racket. His true character only revealed itself in his unflagging devotion to his nuclear family. When Marie became ill and unable to work, he got a part-time job to help with the rent. So, too, when Jennifer gave birth in high school, Mr. Paulsen contributed financially to her care and that of her son.

The clash between his true nature and the depravity of his upbringing caused Mr. Paulsen lasting psychological harm. As stated above, according to Dr. Bardey:

> Mr. Paulsen . . . suffers from trauma and stressor-related disorder caused by his "father's abandonment, being abused and controlled by his grandfather, and his family's ongoing financial difficulties." Ex. C at 14. As a result, he presently "experiences marked distress and significant impairment in important areas of functioning." Id. Stated another way, "Mr. Paulsen's chronic trauma altered his development, causing the lifelong psychological problems that he now manifests, which can best be described as antisocial personality traits." Id. These traits, the doctor concluded, contributed to the offense conduct. Id.

Dr. Bardey maintained, however, that these traits can be unlearned and Mr. Paulsen can, with appropriate therapy, find happiness in sustained pro-social behavior. Indeed, it appears Mr. Paulsen is already on the right path. In this regard, he is extremely contrite about his unlawful conduct. In this regard, I remind the Court of Ms. Cahill's remarks:

> [Mr. Paulsen] is ready to accept responsibility for his actions. I believe as

Hon. Paul A. Crotty
United States District Judge
August 30, 2021
Page 11

> we move forward Michael will become a better
> person.  He has expressed a deep sense of
> remorse during this time he has had to reflect
> on his actions, and has stated to me numerous
> times that he is sorry and regretful for
> everything he has done.  I truly believe in
> his ability to pay his debt to society.  Ex.
> B.

Further, he has done all that he can to mitigate the harm.  In this
regard, first, he met with the government in numerous proffer
sessions.  The government never questioned his willingness to help
or his veracity, it just found that knew too little to make a deal.
And, second, he pleaded guilty in a timely manner, likely to a
Guideline range higher than it would have been had he not
proffered.  In a sense, he is therefore deserving of extraordinary
acceptance of responsibility credit.

Finally, he appears to be making positive life choices.  His
relationship with Ms. Cahill and her daughter ████ is rewarding
for all.  So, too, his present volunteerism and proven work ethic
are laudatory.

### CONCLUSION

For the foregoing reasons, a guideline sentence would be
greater than necessary to comply with generally recognized purposes
of sentencing.  Consistent with the Parsimony Clause, he should
instead be sentenced with the benefit of a substantial downward
variance.

Respectfully submitted,

James M. Branden
Joseph V. Sorrentino

Attorneys for Defendant Michael Paulsen

# EXHIBIT A

# QUANTITY DEPENDENT SENTENCING RANGES, THE DRUG EQUIVALENCY TABLE, AND "OXYCODONE (ACTUAL)"

Michael J. Liston (michaeljliston@gmail.com)

The sentencing ranges for controlled substance offenses in violation of federal law are largely dependent on the type and the quantity of the drug involved in the offense.[1] This dependence is followed with expanded coverage under the Sentencing Guidelines. For most controlled substance offenses involving opiates, including the opiate oxycodone, the guideline sentencing range is determined by application of the Drug Equivalency Table set forth in Application Note 8 (D) to USSG §2D1.1. This Table translates quantities of differing controlled substances into marijuana[2] equivalent quantities which, in turn, generate sentencing ranges

---

[1] Title 21 U.S.C. § 841(a) makes unlawful the knowing or intentional manufacture, possession for distribution, or distribution of any measurable amount of any "controlled substance." Section 841(b) attaches penalties to § 841(a) unlawful conduct. For certain controlled substances the penalties include not only maximum but also mandatory minimum terms of imprisonment. The severity of the § 841(b) penalties are greatly dependent on facts beyond the generic controlled substance conduct described in § 841(a). These additional facts are, principally, the controlled substance type and quantity involved in the § 841(a) conduct and whether there was a resulting death or serious bodily injury. Section 841(a) covers only substantive violations, not attempts or conspiracies, and the § 841(b) penalties attach only to persons who violate § 841(a). However, 21 U.S.C. § 846 provides that anyone who attempts or conspires to commit "any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." Controlled substance importation or exportation offenses and penalties are covered under 21 U.S.C. § 960(a) and § 960(b) and these provisions are counterparts to § 841(a) and § 841(b). The sentencing guidelines, advisory since *United States v. Booker*, 543 U.S. 220 (2005), set forth sentencing ranges within the offense statutory limits. The guideline ranges for all controlled substances are largely dependent on drug type and quantity involved in the offense.

[2] "Marijuana" and "marihuana" are alternative spellings. The "marihuana" alternative prevails in the relevant statutes and in the Sentencing Guidelines, but "marijuana" is otherwise the commonly used form. *See United States ex rel. Smith v. Lane*, 794 F.2d 287, 289 n. 1 (7th Cir. 1986) (noting that the Supreme Court has settled on the "marijuana" spelling). This paper will include both spelling forms — "marihuana" when quoting from or directly referring to statutory or other text employing that spelling form and "marijuana" otherwise.

1

through the §2D1.1(c) Drug Quantity Table.  As the result of guideline amendments effective November 1, 2003, one gram of "oxycodone (actual)" is the equivalent for guideline sentencing purposes of 6.7 kilograms of marijuana.  This "equivalence" is unreasonable and penalizes offenses involving oxycodone differently from and more harshly than offenses involving the other opiates.

A.    Oxycodone, Opiates and the Drug Equivalency Table.

The genesis of the current federal criminal drug legislation is the Comprehensive Drug Abuse and Prevention and Control Act of 1970.[3]  One of the principal and enduring features of the 1970 Act is the classification of controlled substances by assignment to numbered schedules according to the chemical properties, psychological and physical effects, and abuse potential of the different substances.[4]  Oxycodone is classified as a schedule II opiate.[5]  Other schedule II

---

[3]  Pub. L. 91-513, 84 Stat 1236 *et seq.* (1970).

[4]  See H.R. Rep. No 1444, 91st Cong., 2d. Sess., *reprinted in* 1970 U.S. Code Cong & Ad News, 4566.  The classification scheme involving schedules of individually identified substances was designed to facilitate an extremely important feature of the legislation, namely, the addition, subtraction or movement of particular substances from one schedule to another through administrative rather than legislative action under §§ 201 and 202 of Pub. L. 91-513, 84 Stat. 1243-1252, codified at 21 U.S.C. §§ 811 and 812.  "Of key importance are the provisions authorizing the Attorney General to administratively add or remove substances from the schedules or to transfer substances between the various schedules, provided that the characteristics of the substance satisfy the criteria established for the schedule in which the substance is to be placed."  Statement of Rep. Hastings, 116 Cong. Rec. 33,309 (1970).

[5]  Title 21 U.S.C. § 802 (17)(A) identifies a "narcotic drug" as including "[o]pium, opiates, derivatives of opium and opiates" and their related isomers, esters, ethers, and salts.  Title 21 U.S.C. § 802 (18) defines an "opiate" as "any drug or other substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having such addiction-forming or addiction-sustaining liability."  Heroin is an opiate within the foregoing definition and is specifically listed in 21 U.S.C. § 812 as a schedule I "opium derivative."  See 21 C.F.R. § 1308-11.  Schedule II(a)(1), as set forth in 21 U.S.C. § 812, includes all opiates and all opiate derivatives produced either directly or indirectly by extraction from substances of vegetable origin, independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis.  Oxycodone, morphine, hydrocodone, oxymorphone, and fentanyl all fall within the 21 U.S.C. § 802(18) "opiate" definition and the 21 U.S.C. § 812, Schedule II (a)(1) description.  They are all listed in 21 C.F.R. § 1308-12 as schedule II controlled substances.  The principal difference between schedule I substances and

opiates include morphine, hydrocodone,[6] oxymorphone, and fentanyl.[7] Heroin is a schedule I opiate.[8] Oxycodone is not referenced specifically in 21 U.S.C. § 841(b) and its distribution has never been subject to statutory quantity dependent maximum or minimum mandatory penalties. Under 21 U.S.C. § 841(b)(1)(C), the first offense distribution of any amount of a schedule I or schedule II controlled substance, not specifically covered under §§ 841(b)(1)(A), 841(b)(1)(B), or 841(b)(1)(D), is punishable by a maximum period of 20 years imprisonment. As a statutory matter, therefore, any sentence within the 20 year maximum for first offense oxycodone distribution is a permissible sentence. Guideline sentencing ranges within this permitted 20 year maximum depend on quantity calculations under the USSG §2D1.1(c) Drug Quantity Table and/or Drug Equivalency Table.

The Drug Quantity Table does not generate quantity based guideline sentencing ranges for all controlled substances, but only for certain of the more common controlled substances.[9] The Drug Equivalency Table serves two functions. First, it generates quantity based guideline sentencing ranges for controlled substances not specifically referenced in the Drug Quantity Table; and, second, it provides a common standard "equivalence" when differing controlled substances are involved in an offense.[10] Guideline sentencing ranges for

---

schedule II substances is that the former have no "currently accepted medical use" and the latter have a "currently accepted medical use." 21 U.S.C. § 812(1)(B) and § 812(2)(B).

[6] Certain substances containing hydrocodone in limited quantity and combined with nonnarcotic ingredients were, until October 6, 2014, classified as schedule III substances, e.g., "not more than 15 milligrams" of dihydrocodeinone [hydrocodone] "per dosage unit, with one or more active nonnarcotic ingredients in recognized therapeutic amounts." 21 U.S.C. § 812 Schedule III (d)(4). Effective October 6, 2014, the hydrocodone combination products in schedule III were rescheduled as schedule II substances. See 79 Fed. Reg. 49661, 49680 (August 22, 2014).

[7] See note 5, *infra*.

[8] See note 5, *infra*.

[9] The common controlled substances specifically identified in 21 U.S.C. 841(b) and in the guideline Drug Quantity Table include heroin, cocaine, PCP, methamphetamine, fentanyl, LSD and marijuana.

[10] See Application Note 8 (A) and (B) to USSG §2D1.1.

oxycodone offenses have never been derived from the §2D1.1(c) Drug Quantity
Table itself because the Drug Quantity Table has never contained a reference to
"oxycodone."[11] Oxycodone, initially identified simply as "oxycodone" and since
November 1, 2003, as "oxycodone (actual)," has been referenced only in, and
guideline sentences for oxycodone offenses within the statutory maximum have
been derived solely from, the Drug Equivalency Table.

Under the current guideline Drug Equivalency Table, one gram of
"oxycodone (actual)" is equivalent to 6.7 kilograms of marijuana. The same Drug
Equivalency Table equates one gram of heroin, a schedule I controlled substance,
with one kilogram of marijuana. The comparison appears counter-intuitive. There
is, however, a difference. For the great majority of controlled substances,
including heroin and the other schedule I or II opiates except oxycodone, statutory
and guideline quantity measurements include the weight of the carrier medium
without regard for the percentage of the total weight attributable to the controlled
substance alone. However, note (B) of the "Notes" to the USSG §2D1.1(c) Drug
Quantity Table, identifies "oxycodone (actual)" as referring "to the weight of the
controlled substance, itself, contained in the pill, capsule, or mixture." This
description suggests a difference in the manner of measuring oxycodone quantities
and this apparent difference has thus far preserved from constitutional attack the
substantial drug equivalency disparities between oxycodone and heroin.[12]

---

[11] Though the §2D1.1(c) Drug Quantity Table itself does not include the term "oxycodone" in
any form, Note (B) of the "Notes to Drug Quantity Table" identifies "oxycodone (actual)" as
referring "to the weight of the controlled substance, itself, contained in the pill, capsule, or
mixture."
[12] *See, e.g., United States v. Ekasala*, 596 F.3d 74 (1st Cir. 2010) and *United States v. Landron-
Class*, 696 F.3d 62, 75-76 (1st Cir. 2012). *Ekasala* focuses on the appropriateness of responding
to disproportions following from substantially differing pill weights of equivalent doses of
oxycodone and expressly declines to consider the constitutionality of attaching a higher
marijuana equivalent to oxycodone than to an equal weight of heroin. *Ekasala, supra*, at 75-76.
*Landron-Class, supra*, at 76, cites *Ekasala* and proceeds to note that "unlike for many

4

However, and as more fully set forth in the pages that follow, the Drug Quantity Table description of "oxycodone (actual)," to the extent that it suggests, as it would appear to suggest, a measurement of "pure" oxycodone independent of the weight of a carrier medium, is false and misleading.

Whether or not there is constitutional "rationality" in the guideline sentencing distinctions between oxycodone and heroin, in the period after *United States v. Booker*, 543 U.S. 220 (2005) and *Kimbrough v. United States*, 552 U.S. 85 (2007), it has been clear that a sentencing court is free to vary from the guideline ranges based on policy disagreements with the guidelines.[13]   Although there may be a rational basis for making sentencing distinctions between different forms of quantity measurements, an analysis of the process leading to the Sentencing Commission's application of a 6.7 kilogram marijuana equivalency to 1 gram of oxycodone (actual) will reveal that this "equivalence" has little, if anything, to do with oxycodone in its "actual" or "pure" state or with any reasonable "equivalence" comparison of oxycodone to heroin or to any other opiate.[14]

---

prescription drugs, when determining the guideline range for an oxycodone related offense, only the weight of the active ingredient (oxycodone) is used not the full pill weight." The statement therein that "only the weight of the active ingredient (oxycodone) is used" is flatly wrong.

[13]   *See, e.g., United States v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009) ("Thus, after *Kimbrough*, a district court makes a procedural error when it fails to recognize its discretion to vary from the guideline range in a categorical policy disagreement with a guideline.").

[14]   Although, post-*Booker*, the guidelines are advisory rather than mandatory, they are hardly irrelevant. "The Guidelines provide a framework or starting point—a basis, in the commonsense meaning of the term—for the judge's exercise of discretion." *Freeman v. United States*. 131 S.Ct. 2685, 2692 (2011). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007).  Of perhaps more practical significance, there appears to be a convenient cognitive bias for judges to "anchor" their sentences to the calculated guideline range. *See* Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: a Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489 (2014).

B.    A Summary Description of The Pharmacology of Opioids.

An "opiate" is medically defined as "any preparation or derivative of opium."[15]  The term "opioid" was originally used to distinguish synthetic opiate like compounds from opiates derived naturally from opium.[16]  The 21 U.S.C. § 802(18) definition of "opiate" embraces both synthetic "opioids" and "opiates" naturally derived from opium.[17]  The current medical literature appears to use the term "opioid" to cover both the synthetic and naturally occurring opium derivatives. Either term will be used herein interchangeably.

In addition to opium, the opioids of natural origin are primarily morphine, codeine and thebaine, all of which are derived from the seedpod of the poppy plant.  Synthetic or semi-synthetic opioids include, *inter alia*, heroin, fentanyl, oxycodone, hydrocodone, hydromorphone and oxymorphone.

>    Numerous opioid medications are synthetic derivatives of morphine and thebaine, which are produced by relatively simple modifications of the parent molecule.  Examples include transforming morphine into codeine by methyl substitution on the phenolic hydroxyl group; the transformation of morphine to diacetylmorphine by acetylation at the 3 and 6 positions (to produce heroin); and the transfer of morphine into hydromorphine, oxymorphone, hydrocodone, and oxycodone.[18]

>    Opioid medications can be placed into four groups, based on their activity at the opioid receptor site where they bind to produce their effect.  The first group consists of drugs that bind to and activate

---

[15]  Stedman's Medical Dictionary, 28th Edition (2006).

[16]  *Id.*

[17]  See note 5, *infra.*

[18]  MARVIN D. SEPPALA, M.D., PRESCRIPTION PAINKILLERS, HISTORY, PHARMACOLOGY, AND TREATMENT, (2010), page 139.  The penultimate line of the quoted text includes the term "hydromorphine." This is an erroneous spelling in the original text of "hydromorphone." The subsequently quoted text paragraph from the same source includes the correct "hydromorphone" spelling.

6

opioid receptors in the brain, the agonists. It includes the natural opium derivatives morphine and codeine, the semisynthetic mu opioid derivatives such as hydromorphone (Dilaudid), oxymorphone (Numorphan), hydrocodone (Vicodin and others), oxycodone (OxyContin, Percocet, and others), and the synthetic opioids such as meperidine (Demoral)), fentanyl (Sublimaze, Duragesic), methadone, and propoxyphene (Darvocet, Darvon).[19]

Heroin, fentanyl, morphine, oxycodone, hydrocodone, hydromorphone and oxymorphone are all opioid agonists binding at the μ opioid receptors which are found primarily in the brain stem and the medial thalamus. "Mu receptor activity is responsible for supraspinal analgesia (pain relief sensed in the brain), respiratory depression, euphoria, sedation, decreased movement in the stomach and intestines, and intoxication associated with physical dependence."[20] All these opioid substances produce the same effect, albeit with somewhat differing degrees of pharmacological efficacy and differing speeds of passage through the blood brain barrier. "All pain relieving opioids stimulate the mu receptor and all opioids that are addicting do the same. There is a high degree of similarity between the opioid drugs . . . used for pain relief . . .. They all act the same way, as mu receptor agonists."[21]

Morphine, oxycodone, and hydrocodone have "approximate" pharmacological equivalences, i.e. equal doses produce the same effect.[22]

---

[19] SEPPALA, *supra*, at page 138.

[20] SEPPALA, *supra*, at page 140. Opioids work by mimicking the actions of naturally occurring opioids in the brain. "The opioid medications and the endogenous opioids both bind to the same opioid receptors; the difference is that opioid medications, in essence, overstimulate a natural internal opioid system and produce a far more powerful effect. Most, but not all, prescription opioids are opioid agonists — they fully activate the opioid receptor when they bind to it." *Id*. at 137. See generally, GOODMAN & GILMAN'S THE PHARMACOLOGICAL BASIS OF THERAPEUTICS, Chapter 21, Eleventh Edition (2006).

[21] SEPPALA, *supra*, at page 141.

[22] See GOODMAN & GILMAN'S THE PHARMACOLOGICAL BASIS OF THERAPEUTICS, Chapter 21, Table 21-6 ("Dosing Data for Opioid Analgesics), page 580, Eleventh Edition (2006). With respect to the potency correspondence of oxycodone and hydrocodone, in connection with the

Hydromorphone is approximately six times more potent than morphine and oxymorphone is approximately ten times more potent than morphine.[23] "Fentanyl is approximately 100 times more potent than morphine."[24] Heroin is two[25] and perhaps three[26] times more potent than morphine.[27]

## C.    Guideline Drug Equivalency Table History

---

rescheduling of hydrocodone combination products as schedule II controlled substances, the Administrator of the DEA, pursuant to 21 U.S.C. § 811(a) and 21 U.S.C. § 812(b)(2), found that "HCPs have a high potential for abuse. The abuse potential of HCPs is comparable to the schedule II controlled substance oxycodone." 79 Fed. Reg. 49661, 49680 (August 22, 2014). In addition, "[t]he DEA, in agreement with the HHS review, considers the comparison of HCP's to oxycodone products appropriate due to similarities between their pharmacological properties, therapeutic uses and patterns, as well as market history." *Id.* at 49667. Similarly, in its December 16, 2013 recommendation that hydrocodone combination products be subject to control under schedule II, the Department of Health and Human Services noted — "When evaluating a product for scheduling, comparisons with other controlled substances in the same pharmacological class (e.g., opioids) are typically included as a part of the analysis to support assessment of the relative potential for abuse and for dependence. Therefore to assess the appropriate schedule to recommend for hydrocodone, FDA looked to compare its abuse liability with other opioids in Schedule II and III. FDA concurred with DEA that oxycodone products (Schedule II) were the most appropriate comparator for hydrocodone combination products, because of similarities in pharmacology, market history, and patterns and indications for use." Available at http://www.regulations.gov/#!documentDetail;D=DEA-2014-0005-0001, page 5.

[23] See GOODMAN & GILMAN'S THE PHARMACOLOGICAL BASIS OF THERAPEUTICS, Chapter 21, Table 21-6 ("Dosing Data for Opioid Analgesics), page 580, Eleventh Edition (2006).

[24] GOODMAN & GILMAN'S THE PHARMACOLOGICAL BASIS OF THERAPEUTICS, Chapter 21, page 571, Eleventh Edition (2006).

[25] "A person would need to take 30 milligrams ("mg") of oxycodone as opposed to 15 mg of heroin to have an equianalgesic dose of that drug." *United States v. Vigil*, 832 F.Supp. 2d 1304, 1307 (D.NM. 2011) (Finding of Fact 10).

[26] "Heroin (diacetylmorphine) is three times more potent than morphine and is produced from morphine by a slight modification of chemical structure." ROBERT M. JULIEN, CLAIRE D. ADVOKAT, AND JOSEPH E. COMATY, A PRIMER OF DRUG ACTION, page 339, Twelfth Edition (2011).

[27] These pharmacological equivalencies are expert estimates and not derived with mathematical certainty. The potency/efficacy levels are dependent on the pharmacokinetics of the drug and the method of its delivery. "The pharmacokinetics of a drug describes the rate at which the drug is absorbed into the body, distributed throughout the body, metabolized, and eliminated from the body. . . . Factors that affect drug pharmacokinetics include the chosen route of administration." SEPPALA, *supra,* at page 121.

There were no minimum mandatory sentences in the original 1970 § 841(b); only sentences with a maximum term of imprisonment.[28]   There were also no increased sentences based on the quantity, or purity, of the controlled substance involved in the § 841(a) conduct.[29]   The § 841(a) distribution or manufacture of any amount of a scheduled controlled substance would generate the § 841(b) maximum penalty assigned to the schedule classification of that substance.[30]   Drug quantities or purity levels were matters for the court to consider, or not to consider, in the course of sentencing discretion which was virtually unreviewable.[31]

---

[28]   Under § 802(16) of the 1970 Act, the term "narcotic drug" was defined to encompass opiates, cocaine and their respective derivatives and analogues.  Under the original § 841(b)(1)(A), the sentence for the first offense distribution of a controlled substance in schedule I or II which was a "narcotic drug" was "not more than 15 years."  Under § 841(b)(1)(B), the sentence for the first offense distribution of a controlled substance in schedule I or II which was not a "narcotic drug" or of a controlled substance in schedule III, was "not more than 5 years."  Under § 841(b)(2), for controlled substances in schedule IV, the sentence for a first offense conviction was "not more than 3 years;" and under § 841(b)(3), for controlled substances in schedule V, the sentence for a first offense conviction was "not more than one year."

[29]   Controlled substance "quantities" were sometimes relevant in schedule classification.  Certain schedule III controlled substances and all the originally classified schedule V controlled substances were mixtures or compounds containing limited quantities of opiates or opium derivatives, i.e., schedule II controlled substances, but mixed with other substances for medicinal purposes.  Whether the mixture constituted the schedule II controlled substance or a schedule III or V controlled substance depended upon the proportion of the opiate with other substances.  For example, "[n]ot more than 1.8 grams of codeine," a schedule II opium derivative, "per 100 milliliters or not more than 90 milligrams per dosage unit, with an equal or greater quantity of an isoquinoline alkaloid of opium" was a schedule III controlled substance. § 202(a), Schedule III (d)(1), Pub. L. 91-513, 84 Stat. 1251 (1970).  And "[n]ot more than 200 milligrams of codeine per 100 milliliters or per 100 grams" of "one or more nonnarcotic active medicinal ingredients in sufficient proportion to confer upon the compound, mixture, or preparation valuable medicinal qualities other than those  possessed by the narcotic drug alone" was a schedule V controlled substance. § 202(a), Schedule V (1), Pub. L. 91-513, 84 Stat. 1252 (1970).  Until October 6, 2014, certain hydrocodone combination products were classified as schedule III controlled substances.  See note 6, *infra*.

[30]   There was an exception in the 1970 legislation which has not been altered.  Title 21 U.S.C. § 841(b)(4) covers the distribution of a "small amount of marihuana for no remuneration," and treats such a distribution as a misdemeanor.

[31]   "Tribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge

This sentencing structure and related broad sentencing discretion persisted until the mid-1980s.[32]  In 1984 the Controlled Substances Penalties Amendments Act of 1984[33] amended § 841(b) to create for the first time quantity dependent increases in the maximum penalties for § 841(a) conduct involving schedule I or II narcotic drugs, marijuana, hashish, PCP, and LSD.[34]  The amendments also eliminated disparities caused by classifications of controlled substances as narcotic

---

could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." *Williams v. New York*, 337 U.S. 241, 246 (1949).  In 1970, as part of the Organized Crime Control Act of 1970, Congress added, as Pub. L. 91-452, Title X, Sec. 1001(a), 84 Stat. 951, § 3577 to Title 18 of the U.S. Code — "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States  may receive and consider for the purpose of imposing an appropriate sentence."  The provision is now located at 18 U.S.C. § 3661.

[32]   There was an exception.  In 1980 a provision added as a rider to the Infant Formula Act of 1980, Pub. L. 96-359, 94 Stat. 1194 (1980) amended § 841(b) by creating a new subparagraph, namely, § 841(b)(6).  In relevant part the new subparagraph provided that "[i]n the case of a violation of subsection (a) involving a quantity of marihuana exceeding 1,000 pounds, such person shall be sentenced to a term of imprisonment of not more than 15 years." Pub. L. 96-359, § 8(c), 94 Stat. 1194 (1980).  Under 21 U.S.C. § 812(c)(1970), marihuana was listed as a schedule I controlled substance.  Marihuana, however, was not a "narcotic drug" within the meaning of 21 U.S.C. § 802(16)(1970).  Until the 1980 amendment, the maximum penalty for the distribution of marihuana in any amount was five years imprisonment.  21 U.S.C. § 841(b)(1)(B).   The 1980 amendment, therefore, increased the maximum penalty from 5 years to 15 years, "in the case of" a § 841(a) violation "involving" more than 1000 pounds of marihuana.
[33]   Pub. .L. 98-473, Title II, Ch. V, § 501, 98 Stat. 2068 (1984).  This Act was Ch. V of the Comprehensive Crime Control Act of 1984, Pub.L. 98-473, Title II 98 Stat. 1837, *et seq.* (1984).  The Sentencing Reform Act of 1984, which spawned the guidelines, was also part of Pub. L. 98-473, at Ch. II § 211 *et seq.*, 98 Stat. 1987 *et seq.* (1984).
[34]   The 1984 amendments added a new § 841(b)(1)(A) to cover the quantity dependent increases in the maximum penalty for schedule I or II narcotic drugs, PCP and LSD.  The new maximum penalty for a first offense conviction was 20 years.  The previous § 841(b)(1)(A) was redesignated as § 841(b)(1)(B) and was amended to cover controlled substances in schedule I and II, "except as provided in subparagraphs (A) and (C)."  The maximum penalty under the new § 841(b)(1)(B) was 15 years.  This was an increase from 5 years for schedule I and II controlled substances that were not narcotic drugs and were not covered in an amended § 841(b)(1)(C).  Under the amended § 841(b)(1)(C), cases involving less than 50 kilograms of marijuana, 10 kilograms of hashish,  or one kilogram of hashish oil or in the case of any controlled substance in schedule III" the maximum penalty was 5 years imprisonment.  See Pub. L. 98-473, Ch. V, § 502, 98 Stat. 2068 (1984), codified at 21 U.S.C. § 841(b) (1982 Ed. Supp. II).

10

or non-narcotic and the penalty increases were relatively modest.  Moreover, the quantity measurements were based on the weight of the pure substance, not on the weight of the entire mixture containing the substance.[35]

   In 1986, the Narcotic Penalties and Enforcement Act of 1986[36] again amended § 841(b) by substantially increasing maximum penalties, continuing and increasing quantity dependent maximum penalties, and adding quantity dependent minimum mandatory sentences.  The § 841(b) quantity dependent sentencing ranges attached to a limited number of controlled substances, namely, heroin, cocaine, PCP, LSD, fentanyl and marihuana.[37]  With one exception,[38] however, the

_____

[35] "The 1984 amendments were intended 'to provide a more rational penalty structure for the major drug trafficking offenses,' S.Rep. No. 98-225, p. 255 (1983), U.S. Code Cong. & Admin News 1984, pp. 3182, 3437 by eliminating sentencing disparities caused by classifying drugs as narcotic and nonnarcotic. *Id.* at 256.  Penalties were based instead upon the weight of the pure drug involved." *Chapman v. United States*, 500 U.S. 453, 460-461 (1991) (emphasis added).
[36] Pub. L. 99-570, § 1002, 100 Stat. 3207-2 (1986).
[37] The 1986 amendments added new §§ 841(b)(1)(A) and 841(b)(1)(B). Each section covered the same limited number of controlled substances, but in differing threshold amounts. Meeting the § 841(b)(1)(A) thresholds produced for a first offense conviction a maximum life sentence and a minimum mandatory 10 year sentence. Meeting only the § 841(b)(1)(B) thresholds produced for a first offense conviction a 40 year maximum sentence and a minimum mandatory 5 year sentence. Under a new § 841(b)(1)(C), there was a 20 year maximum  sentence, but no minimum mandatory sentence, for first offense convictions for the distribution of any schedule I or II controlled substance in any amount, excepting marijuana, and except to the extent otherwise covered in §§ 841(b)(1)(A) or 841(b)(1)(B).  A redesignated § 841(b)(1)(D)  covered marijuana related controlled substances in quantities not covered in §§ 841(b)(1)(A) or 841(b)(1)(B) and schedule III controlled substances with maximum penalties for first offense convictions limited to 5 years. Pub.L. 99-570, Title I, §§ 1002 and 1003, 100 Stat. 3207-2-3207-5 (1986).
[38] The exception was phencyclidine (PCP).  The 1986 amendment, Pub.L. 99-570, 100 Stat. 3207-2, as codified at 21 U.S.C. § 841(b)(1)(A)(iv), attached a minimum mandatory 10 year sentence and a life term maximum to "100 grams or more of phencyclidine (PCP) or 1 kilogram or more of a mixture or substance containing a detectable amount of phencyclidine (PCP)."  This was the only schedule I or II controlled substance with a § 841(b) statutory quantity dimension based at least in part on drug purity in the 1986 amending legislation.  In the Anti-Drug Abuse Amendments Act of 1988, Pub.L. 100-690, Title VI, §§ 6470(g) and 6470(h), 102 Stat.4371 (1988), § 841(b) was amended by adding subparagraphs § 841(b)(1)(A)(viii) and § 841(b)(1)(B)(viii) to provide methamphetamine with similar "purity" treatment.  PCP and methamphetamine remain the only two controlled substances with § 841(b) statutory penalties based, at least in part, on "purity" calculations. See also, note 29, *infra*, regarding schedule classification based on controlled substance quantities within certain compounds.

quantities were measured, not by the weight of the pure controlled substance involved, but by the weight of the mixture containing a "detectable" amount of the controlled substance without regard for the percentage of the actual substance within the mixture.[39]

These two sets of amendments, except to the extent the latter set required the imposition of a minimum mandatory sentence, did not affect a court's broad sentencing discretion, but simply increased the range within which the court could exercise that discretion. For example, the 1984 amendments raised the maximum quantity dependent penalties under § 841(b)(1)(A) for first offense convictions to twenty years while the 1986 amendments set a ten year minimum mandatory floor and a life maximum for such convictions. The fact that there was a significant increase in the range within which a court could exercise its sentencing discretion did not necessarily require proportional increases in the sentences actually imposed. The Sentencing Guidelines, however, filled in the additional maximum sentencing space with a series of mandatory (pre-*Booker*) sentencing ranges based primarily on drug type and carrier medium quantity.

The guidelines first went into effect on November 1, 1987. There was a note attached to the original §2D1.1(c) Drug Quantity Table as follows —

> The scale amounts of all controlled substances refer to the total weight of the controlled substance. Consistent with the provisions of the Anti-Drug Abuse Act, if any mixture of a compound contains any detectable amount of a controlled substance, the entire amount of the mixture or compound shall be considered in measuring the quantity. If a mixture or compound contains a detectable amount of more than one controlled substance, the most serious controlled substance shall determine the categorization of the entire quantity.

Although the guideline drug quantity measurements followed the 1986 statutory lead by weighing the entire carrier medium along with the controlled

---

[39] Pub.L. 99-570, 100 Stat. 3207-2 -3207-4 (1986).

substance within the medium, the decision to do so was not logically required. The Parole Commission Offense Severity Index, utilized in setting appropriate periods of imprisonment prior to parole consideration, measured the severity of opiate and cocaine offenses on the basis of purity levels. "'Equivalent amounts for the cocaine and opiate categories may be computed as follows: 1 gram of 100% pure is equivalent to 2 grams of 50% pure and 10 grams of 10% pure, etc."[40]

The original 1987 §2D1.1 Drug Equivalency Table for schedule I or II opiates was based on heroin equivalents, not marijuana equivalents. For the most part, the "equivalences" of the various opiates in relation to heroin tended to match the pharmacological equivalence referenced in the preceding section of this paper. Thus under the original Drug Equivalency Table, one gram of each of morphine, oxycodone, and hydrocodone was the equivalent of one half a gram of heroin. Because of the Sentencing Commission's deference to the statutory quantity distinctions, however, and as reflected in Application Note 10 to the original §2D1.1, the "ratios in the Drug Equivalency Tables do not necessarily reflect dosages based on pharmacological equivalents."[41] Nonetheless, it was clear that the Drug Equivalency Table, at least with respect to schedule I and II opiates, was

---

[40] 28 C.F.R. § 2.20, Note (2) to Ch. 9, §§ 921 *et seq.* (1985).

[41] For example, the Narcotics Penalties Enforcement Act of 1986, Pub. L. 99-570, 100 Stat. 3207-2 (1986), amended 21 U.S.C. § 841(b)(1)(A) to provide the same minimum mandatory and maximum penalties for the distribution of 1 kilogram or more of a mixture containing heroin as for the distribution of 400 grams or more of a mixture containing fentanyl. See, respectively, § 841(b)(1(A)(i) and § 841(b)(1)(A)(vi). As noted, *infra*, fentanyl is estimated to be up to 100 times more potent than heroin. The original 1987 guideline Drug Quantity Table offense levels matched the statutory ratios between heroin and fentanyl, i.e., 1 to 2.5, but the original Drug Equivalency Table equated 1 gram of fentanyl with 31.25 grams of heroin. The Drug Equivalency Table was amended, effective November 1, 1989, to equate 1 gram of fentanyl with 2.5 grams of heroin — "to conform the equivalency for fentanyl . . . to that set forth in the Drug Quantity Table and statute." See Reason for Amendment, Federal Sentencing Guidelines Manual, Appendix C, Amendment 126 (1989). Despite a pharmacological potency for fentanyl greatly exceeding two and one-half times that of heroin, that ratio persists in both the current statute and the current guidelines.

designed to reflect a pharmacologically accurate potency equivalence of the opiate in question with heroin. It is, of course, anomalous, in the absence of proportionally uniform carrier medium weights, to measure drug quantities by the total weight of the carrier medium that includes the substance and at the same time employ pharmacological equivalences, which necessarily assume equivalent purity levels, when applying the Drug Equivalency Table. It does not make a lot of sense, but it was consistent. The anomaly touched virtually all the controlled substances.

The Drug Equivalency Table was amended effective November 1, 1991,[42] to reference conversion to a single substance, marijuana, rather than to the previous four substances.[43] In its Reason for Amendment, the Commission noted that "the use of one referent rather than four makes no substantive change but will make the required computations easier and reduce the likelihood of computational error."[44] The ratios of the other opiates to heroin remained the same. For example, one gram of heroin was equivalent to one kilogram of marijuana, while one gram of each of morphine, oxycodone, and hydrocodone was equivalent to 500 grams of marijuana. The marijuana quantities were not pharmacological equivalents, but simply sentencing slots. The pharmacological potency relationships of these other opiates to heroin remained constant.

---

[42] Federal Sentencing Guidelines Manual, Appendix C, Amendment 396 (1991).

[43] In the original Drug Equivalency Table, there were four referent "equivalents" — heroin for the schedule I and II opiates; cocaine for the schedule I and II stimulants; heroin or PCP for LSD, PCP and the other schedule I or II hallucinogens; and marihuana/heroin for the remaining controlled substances. USSG §2D1.1 Drug Equivalency Table Federal Sentencing Guidelines Manual (1987).

[44] Federal Sentencing Guidelines Manual, Appendix C, Amendment 396 (1991). The Reason for Amendment also reinforced the intended pharmacological equivalences of the schedule I and II opiates indicating that "the equivalencies for Schedule III substances are not statutorily based, nor are the pharmacological equivalencies as clear as with Schedule I or II substances." (Emphasis added).

14

Despite the statutory quantification of LSD to include the weight of the carrier medium and the approval of this measurement method in *Chapman v. United States*, 500 U.S. 453 (1991), effective November 1, 1993, the Sentencing Commission amended the §2D1.1(c) notes following the Drug Quantity Table so that LSD quantities were to be measured by dosage unit without the weight of the carrier medium, i.e.. "to treat each dose of LSD on the carrier medium as equal to 0.4 mg of LSD for the purposes of the Drug Quantity Table."[45]  In the "Reasons for Amendment," the Commission noted that it found that the weights of LSD carrier media "vary widely and typically far exceed the weight of the controlled substance itself. . . . As a result, basing the offense level on the entire weight of the LSD and carrier medium produces unwarranted disparity among offenses involving the same quantity of actual LSD but different carrier weights, <u>as well as sentences that are disproportionate to those for other, more dangerous controlled substances</u>." (Emphasis added).[46]   The guideline amendment, now set forth in Note (G) following the §2D1.1(c) Drug Quantity Table, has no effect on § 841(b) statutory quantification which includes the weight of the LSD carrier medium.[47]  For guideline purposes, however, there is Commission acknowledgement that sentencing based on carrier weight is imperfect.

Effective November 1, 1995, the Commission modified the §2D1.1(c) Drug Quantity Table to alter the method for determining offense levels for schedule I and II depressants and schedule III, IV, and V controlled substances —

> . . . by applying the Drug Quantity Table according to the number of pills, capsules, or tablets rather than by the gross weight of the pills, capsules or tablets.  Schedule I and II Depressants and Schedule II, IV and, V substances are almost always in pill, capsule, or tablet form.

---

[45]  See Federal Sentencing Guidelines Manual, Appendix C, Amendment 488 (1993).
[46]  *Id.*
[47]  *See Neal v. United States*, 516 U.S. 284 (1996).

15

The current guidelines use the total weight of the pill, capsule or tablet containing the controlled substance. This method leads to anomalies because the weight of most pills is determined primarily by the filler rather than the controlled substance. <u>Thus, heavy pills lead to higher offense levels even though there is little or no relationship between gross weight and the potency of the pill</u>. Applying the Drug Quantity table according to the number of pills will both simplify guideline application <u>and more fairly assess the scale and seriousness of the offense</u>. (Emphasis added).[48]

Schedule I and II opiates, even the prescription medications in pill, capsule, and tablet form, were not included.[49]   Nonetheless, as with LSD, there is Commission acknowledgement that setting offense levels based on gross weight including fillers rather than on the weight of the controlled substance active ingredient is hardly satisfactory.[50]

D.   <u>The One Gram "Oxycodone (Actual)" Conversion to 6.7 Kilograms of Marijuana Is Unreasonable</u>.

The current §2D1.1(c) Drug Equivalency Table, attaching 6.7 kilograms of marijuana to one gram of oxycodone (actual), is the product of amendments to the

---

[48]  Federal Sentencing Guidelines Manual, Appendix C, Amendment 517 (1995).

[49]  There are schedule III and schedule V opiates which are mixtures or compounds containing limited quantities of opiates or opium derivatives, i.e., schedule II controlled substances, but mixed with other substances for medicinal purposes. Whether the mixture constitutes the schedule II controlled substance or a schedule III or V controlled substance depends upon the proportion of the opiate with the other substances. At the time of this amendment, 21 U.S.C. § 812, Schedule III (d)(4) identified "[n]ot more than 15 milligrams [of dihydrocodeinone] per dosage unit, with one or more active, nonnarcotic ingredients in recognized therapeutic amounts." "Dihydrocodeinone" is a synonym for "hydrocodone." There were no such hydrocodone combination products in excess of 10 mg. Vicodin is hydrocodone and acetaminophen. Until October 6, 2014, a 10 milligram Vicodin was a schedule III controlled substance covered under the 1995 amendment. Percocet is oxycodone and acetaminophen. Despite its equivalent opioid pharmacological equivalence to Vicodin, Percocet was not a schedule III substance in any amount and is not covered under the 1995 amendment. See also, notes 6 and 29, *infra*.

[50]  See text at pages 14-15, *infra*, and the Commission's rationale in Amendment 488 for quantifying LSD for guideline purposes by dosage unit and without regard for carrier medium weight.

guidelines made effective on November 1, 2003.[51] The rationale for the amendments modifying the oxycodone equivalence is fully disclosed in the "Reason for Amendment" section of the Sentencing Commission's "Official Text" of those amendments, quoted at length in the accompanying note.[52] The

---

[51] Federal Sentencing Guidelines Manual, Appendix C, Amendment 657 (2003).

[52] As "Official Text," the following "Reason for Amendment" text is available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text/20030501_Amendments.pdf. See also, Federal Sentencing Guidelines Manual, Appendix C, Amendment 657 (2003) —

"This amendment responds to proportionality issues in the sentencing of oxycodone trafficking offenses. Oxycodone is an opium alkaloid found in certain prescription pain relievers such as Percocet and OxyContin. This prescription drug generally is sold in pill form and, prior to this amendment, the sentencing guidelines established penalties for oxycodone trafficking based on the entire weight of the pill. The proportionality issues arise (1) because of the formulations of the different medicines; and (2) because different amounts of oxycodone are found in pills of identical weight.

"As an example of the first issue, the drug Percocet contains, in addition to oxycodone, the non-prescription pain reliever acetaminophen. The weight of the oxycodone component accounts for a very small proportion of the total weight of the pill. In contrast, the weight of the oxycodone accounts for a substantially greater proportion of the weight of an OxyContin pill. To illustrate this difference, the Percocet pill containing five milligrams (mg) of oxycodone weights approximately 550 mg with oxycodone accounting for 0.9 percent of the total weight of the pill. By comparison, the weight of an OxyContin pill containing 10 mg of oxycodone is approximately 135 mg with oxycodone accounting for 7.4 percent of the total weight. Consequently prior to this amendment, trafficking 364 Percocet pills or 1481 OxyContin pills resulted in the same five year sentence of imprisonment. Additionally, the total amount of the narcotic oxycodone involved in this example is vastly different depending on the drug. The 364 Percocets produce 1.8 grams of actual oxycodone while the 1,481 OxyContin pills produce 14.8 grams of oxycodone.

"The second issue results from differences in the formulation of OxyContin. Three different amounts of oxycodone (10, 20, and 40 mg) are contained in pills of identical weight (135 mg). As a result, prior to this amendment, an individual trafficking in a particular number of OxyContin pills would receive the same sentence regardless of the amount of oxycodone contained in the pills.

"To remedy these proportionality issues, the amendment changes the Drug Equivalency Tables in §2D1.1 . . . to provide sentences for oxycodone offenses using the weight of the actual oxycodone instead of calculating the weight of the entire pill. The amendment equates 1 gram of actual oxycodone to 6,700 grams of marihuana. This equivalency keeps penalties for offenses involving 10 mg OxyContin pills identical to levels that existed prior to the amendment, substantially increases penalties

17

amendment was prompted by a disproportion in the guideline sentencing ranges resulting from the differing pill weights of two oxycodone medications — Percocets and OxyContins. Percocets were compounds of oxycodone with acetaminophen. A Percocet pill containing 10 mg of oxycodone weighed 550 mg. Less than 1% of the weight was attributable to the 10 mg. oxycodone active ingredient. OxyContin pills, whether containing 10 mg, 20 mg, or 40 mg of oxycodone, each weighed 135 mg. In the 10 mg OxyContin, 7.4% of the weight was attributable to the oxycodone active ingredient.[53] Prior to the amendment, oxycodone quantities were measured by the total weight of the carrier medium that included the oxycodone — "Consequently prior to this amendment, trafficking involving 364 Percocet pills or 1,481 OxyContin pills resulted in the same five year sentence of imprisonment."[54] Though the Sentencing Commission resolved the disproportion between different formulations of oxycodone, specifically Percocets and OxyContins, in the process it created a unique "equivalency" for oxycodone offenses that was neither based on "actual" oxycodone content nor rationally related to any pharmacological or other equivalence among oxycodone and the other opiates.

Though, as already noted, there is anomaly in a process that on the one hand calculates quantities to include the weight of the carrier medium as well as the controlled substance in which it is contained and on the other hand engages an equivalency table which assumes pharmacological equivalent purity,[55] one would

for all other doses of OxyContin, and decreases somewhat the penalties for offenses involving Percocet."

[53] Since the 20 mg and the 40 mg OxyContin pills each also weighed 135 mg, the weight attributable to the oxycodone active ingredient was, respectively 14.8% and 29.6%.

[54] See note 52, *infra*.

[55] This disconnect was noted in the 1995 amendments which altered the method for determining offense levels for schedule I and II depressants and schedule III, IV, and V controlled substances. See text at pages 15-16, *infra*.

18

expect that in apparently deciding to calculate oxycodone quantities on an "actual" active ingredient content basis, there would be an attempt to make at least some comparison with the other opiates in their respective "actual" active ingredient states.  But there was none of that.  Rather the 6.7 kilogram marijuana equivalence for oxycodone was produced by calculating the weight of the one hundred 10 mg OxyContin pills necessary to constitute one gram of the actual oxycodone active ingredient.  Since each 10 mg pill weighed 135 mg, the weight of the 100 pills necessary to produce the one gram oxycodone active ingredient was 13.5 grams. The Commission's next step was the application of the prior marijuana equivalence to the 13.5 gram weight of the 100 OxyContin 10 mg pills.  The pre-amendment equivalence was one gram of oxycodone to one half a kilogram of marijuana. Thus prior to the amendment, the 13.5 gram weight of one hundred 10 mg oxycodone pills would translate to 6.75 kilograms of marijuana.  With a bit of an unexplained discount, the new one gram "oxycodone (actual)" became the equivalent of 6.7 kilograms of marijuana.  Only in this manner, could the penalties for offenses involving 10 mg OxyContin pills be kept "identical to levels that existed prior to the amendment."[56]  However, only 7.4% of oxycodone (actual) was contained in each of the 10 mg OxyContin pills used to create the new equivalence. As a result, only 7.4% of the 13.5 grams was the weight of the actual oxycodone. "Oxycodone (actual)" under the guidelines is, therefore, a 7.4% oxycodone content that is attached to all oxycodone formulations.  Because there was no such "actual" level attached to heroin or other opiates and no comparative weights of common quantity mixtures containing heroin or other opiates, the new oxycodone (actual) equivalence is limited to oxycodone formulations.  Though it provides a common standard for the various oxycodone formulations, it eliminates any appropriately

---

[56] See note 52, *infra.*

comparative relationship of oxycodone to heroin, to the other opiates, or, for that matter, to any other controlled substance.

Had the Commission used the 20 mg OxyContin pill, which also weighed 135 mg and thus contained 14.8% of oxycodone actual, the translation would have produced a 3.35 kilogram marijuana equivalence per gram oxycodone actual. Using the equally weighted 40 mg OxyContin pill, 29.6% of which was oxycodone (actual), would have halved the marijuana equivalence once again to 1.67 kilograms per gram oxycodone (actual). The selection of the 10 mg OxyContin pill, with only a 7.4% oxycodone (actual) content, rather than the 20 mg or 40 mg pill, is arbitrary. The selection of any one of them, even the Percocet,[57] would have resolved the guideline sentencing disproportion between Percocet trafficking and Oxycontin trafficking. But none of such measurements would constitute a meaningful translation of comparative opiate potency. At base there was simply a weighing of pills in one oxycodone formulation to create a pseudo "purity" for all formulations with an actual measured purity level of only 7.4%. In contrast, "PCP (actual)," "methamphetamine (actual)," and "amphetamine (actual)," are identified in Note (B) to the §2D1.1(c) Drug Quantity Table as "refer[ring] to the weight of the controlled substance, itself, contained in the mixture or substance." The same Note similarly identifies "oxycodone (actual)." However, there is an explanatory example added only to the PCP, methamphetamine, and amphetamine "(actual)" definition, i.e.,— "For example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual)." Thus these controlled substances "(actual)" are measured at 100% purity. Oxycodone (actual) is not so measured.

---

[57]   It would have taken 550 ten milligram Percocets to produce one gram of oxycodone (actual). The weight of those pills would be 55 grams. The Percocets would have translated into a new marijuana equivalence of 27.5 kilograms for each one gram oxycodone (actual).

The treatment of oxycodone is unique and the "(actual)" suffix inappropriate and misleading.[58]

After the amendment, one gram of pure heroin remained the equivalent of only one kilogram of marijuana.  There was also no alteration in the marijuana equivalents for the other opiates which remained tied to comparative pharmacological equivalence with heroin.[59]  Heroin, of course, is normally not found or used in pure form, packaged with uniform purity levels, or labeled to reflect the actual heroin content.  It is, therefore, conveniently calculated as it is found, that is, on the basis of its own weight and the weight of its carrier medium.  Nonetheless, statistics, drawn primarily from retail and dealer level undercover purchases and government seizures, reveal the average purity of packaged heroin at the retail and dealer stages of its distribution.

Established in the Executive Office of the President is an Office of National Drug Control Policy ("ONDCP").[60]  The ONDCP is charged, *inter alia*, with assessing and measuring changes in the price and purity of heroin.[61]  It publishes Data Supplements updating annually national level drug prices and purity trends

---

[58]  The Minutes of the March 26, 2003 U. S. Sentencing Commission Public Meeting during which a motion to promulgate the amendments was passed unanimously are available at http://www.ussc.gov/amendment-process/public-hearings-and-meetings/20030325-26/minutes-march-26-2003.  The minutes suggest that the Commission might not have fully grasped the consequences of the amendment.  Vice Chair Steer "stated that he is very pleased with this proposed amendment because he believes it is a rational approach to focus on the controlled substance itself and provide for proportional guideline penalties based on the amount of the controlled substance, rather than the way the substance is formulated," Ex Officio Commissioner Jaso noted "that this proposed amendment brings proportionality by basing oxycodone penalties on the amount of the active ingredient rather than the delivery substance." It is interesting that the representative of the Department of Justice, Ex Officio Commissioner Jaso, limited the "proportionality" to "oxycodone penalties" only, while Vice Chair Steer matched "proportionality" with "controlled substances" generally.

[59]  In the case of the opiate fentanyl, however, the ratio to heroin was based on the statute.  See note 41, *infra*.

[60]  21 U.S.C. § 1702(a).

[61]  21 U.S.C. § 1705(a)(2)(A)(vi)(V).

for three controlled substance types, one of which is heroin. Table 63 of the National Drug Control Strategy, Data Supplement 2013[62] is entitled "Average Price and Purity of Heroin in the United States, 1981-2011 (2011 Dollars)." The Table 63 figures for the last 5 year period listed —from 2007 through 2011— indicate that the average heroin purity for retail level heroin "packages" of 1 gram or less was 31.2%.[63]

The oxycodone purity of the 10 mg OxyContin pills used in producing the 6.7 kilogram marijuana equivalence was 7.4%. Average heroin "package" purity at street level quantities of 1 gram or less revealed in the Data Supplement 2013 Table 63 is over four times that amount. In addition, heroin is a schedule I controlled substance without any acceptable medical use, is pharmacologically twice as potent as oxycodone, and, unlike prescription medications such as oxycodone, heroin "packages" are distinctly susceptible to hidden and deadly

---

[62] Available at http://www.whitehouse.gov/sites/default/files/ondcp/policy-and-research/2013_data_supplement_final2.pdf. The drug price and purity trends are the product of ONDCP commissioned studies. "DEA's System to Retrieve Information on Drug Evidence (STRIDE) is the primary source of data for this study. STRIDE provides laboratory analyses of street-level drug purchases and of drugs removed from the marketplace where DEA participated in the seizure(s). The system also provides analyses of drug evidence and their physical and chemical attributes to determine geographic origins. Regional price and purity trends are weighted by DAWN data to calculate a national-level estimate. These estimates became available in July 2008, prepared by the Institute of Defense Analyses. In 2012, the same methodology was applied to data through 2011. Price data are expressed in current dollars." *Id.* at page 10.

[63] Table 63 of the 2013 Data Supplement also indicated that the average heroin purity over the same period for purchases greater than 1 gram and up to 10 grams was 30% and for seizures and purchases greater than 10 grams it was 64.4%. There is a more recent Data Supplement, the National Drug Control Strategy, Data Supplement 2014, available at http://www.whitehouse.gov/sites/default/files/ondcp/policy-and-research/ndcs_data_supplement_2014.pdf. The corresponding Table in the 2014 Data Supplement is Table 67. In the 2014 Table, however, the retail purchase figures begin at purchases of 10 grams or less, and thus not all of such purchases are likely to constitute street level user "packages." In any event the last five year average — 2008 through 2012 — the purity level at this 10 grams or less quantity was 28.6%. For purchases greater than 10 grams and up to 100 grams the corresponding average purity was 38.2%, and for seizures greater than 100 grams the corresponding average purity was 61.8%.

adulteration.[64]  From any perspective, heroin is more dangerous than oxycodone. Comparatively, however, guideline sentencing ranges for oxycodone offenses are more severe than guideline sentencing ranges for heroin offenses.  Whether or not there are valid reasons for punishing illegal prescription opiate distribution harshly,[65] there were no such reasons motivating the Commission decision to attach a marijuana equivalence of 6.7 kilograms to each gram of purported "oxycodone (actual)."[66] A sentence for an oxycodone offense that is based on a sentencing range so calculated can only be a reasonable sentence accidentally.[67]

---

[64]  In 2011 there were 258,482 emergency room visits associated with heroin use and 151,218 such visits associated with oxycodone use.  See Substance Abuse and Mental Health Services Administration, *Drug Abuse Warning Network, 2011: National Estimates of Drug-Related Emergency Department Visits.* HHS Publication No. (SMA) 13-4760, DAWN Series D-39. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2013, available at http://www.samhsa.gov/data/2k13/DAWN2k11ED/DAWN2k11ED.htm.

[65]  Although there have been recent dramatic increases in prescription opiate abuse, the suggestion that oxycodone or similar opiates are automatic gateways to heroin and an otherwise avoidable life of addiction is hardly clear.  The problem of opiate "addiction" is somewhat more complex.

> "The study by Inciardi and colleagues indicates that the abuse of prescription opioids such as OxyContin may lead to heroin abuse among individuals who have shown signs of drug abuse or dependence before they began abusing prescription opioids.  It is much less likely that a person without previous drug or alcohol abuse will progress to heroin from OxyContin or other prescription opioid abuse.  These conclusions by Inciardi and his colleagues have also been reached  repeatedly in other studies:  The abuse of OxyContin is rarely the initiating factor leading to the abuse of other drugs (Sees, et al. 2005); patients diagnosed with OxyContin dependence have high rates of substance abuse that predated the use of OxyContin (Potter et al. 2004); and people without a history of drug or alcohol abuse are unlikely to become addicted  to prescription painkillers when they are prescribed for legitimate purposes (Edlund et al. 2007)."

SEPPALA, *supra*, at 108.

[66]  See note 52, *infra*.

[67]  The courts tend to be oblivious to the fact that "oxycodone (actual)" is hardly "actual" oxycodone.  The cases challenging the equivalence are both surprisingly few and also lacking in meaningful analysis.  A common response to such challenges is the fundamentally inaccurate note that "unlike for many prescription drugs, when determining the guideline range for an oxycodone related offense, only the weight of the active ingredient (oxycodone) is used, not the full pill weight." *United States v. Landron-Class*, 696 F.3d 62, 75-76 (1st Cir 2012). *See also, e.g., United States v. Lewis*, 521 Fed.Appx. 109, 111 (4th Cir, 2013) ("only the active ingredient in . . . oxycodone is used"); *United States v. Nassar*, 373 Fed.Appx. 564, 565 (6th Cir. 2010)

E.    Hydrocodone and Oxycodone.

Certain formulations containing hydrocodone — a schedule II opiate pharmacologically equivalent to oxycodone[68] — but in limited quantity and combined with nonnarcotic therapeutic ingredients, were, until October 6, 2014, classified as schedule III substances, e.g., those formulations that comprise "not more than 15 milligrams" of dihydrocodeinone [hydrocodone] "per dosage unit, with one or more active nonnarcotic ingredients in recognized therapeutic amounts." 21 U.S.C. § 812 Schedule III (d)(4).   Since amendments effective November 1, 1995, guideline sentencing ranges for such schedule III hydrocodone combination products were determined under the §2D1.1(c) Drug Quantity Table on the basis of the number of "units" rather than on the carrier medium inclusive weight or active ingredient purity level.   None of the schedule III hydrocodone combination products, per unit, contained more than 10 milligrams of hydrocodone,[69] and, like Percocets, they generally included acetaminophen as the therapeutic addition.   As with Percocets, the weight of acetaminophen in the unit,

---

("oxycodone is converted using its actual pure weight").   One case in which the equivalence was challenged in detail, *United States v. Vigil*, 832 F.Supp.2d 1304 (D. NM 2011), is long on conclusory statements but very short on reasoned analysis.   There is an erroneous focus on marijuana as the pharmacological comparator and there is no apparent recognition that the "oxycodone (actual)" in any formulation is only 7.4% pure.   Notwithstanding the case's factual detail, the *Vigil* court also treats "oxycodone (actual)" as if it were in fact "actual," — "[o]ther opiate offenses focus on the total weight of the mixture or substance when calculating the drug amount while oxycodone offenses focus on the weight of the actual drug." *Id.* at 1328. Apparently in this era of 97+% guilty pleas, plea agreements, and the post-*Booker* judicial discretion to disagree with the guidelines, sentencing hearings tend to be anticlimactic and the oddities surrounding "oxycodone (actual)" of *de minimus* import.

[68]   See generally, pages 5-8, *infra*. See also, note 22, *infra*.

[69]   A listing of the hydrocodone combination products approved by the Federal Drug Administration may be found in the FDA Orange Book of Approved Drug Products available at http://www.accessdata.fda.gov/scripts/cder/ob/docs/queryai.cfm. Excluding the recently approved single entity Zohydro ER, none of the products exceed 10 mg per dose.

usually 325 mg, greatly exceeded the weight of the active hydrocodone ingredient.[70]

Effective October 6, 2014, hydrocodone combination products were rescheduled from schedule III to schedule II.[71]  As a result, guideline sentencing ranges for the hydrocodone combination products previously classified as schedule III substances will be determined under the §2D1.1(c) Drug Equivalency Table on the basis of the full unit weight and with a marijuana equivalence of 1 gram to one-half a kilogram of marijuana.  This will produce an immense increase in the guideline sentencing ranges for the distribution of hydrocodone combination products.[72]

Prior to October 25, 2013, FDA approved hydrocodone products were limited to the schedule III combination products, none of which exceeded a hydrocodone active ingredient content of 10 mg.[73]  On October 25, 2013, the FDA approved Zohydro ER, a single entity hydrocodone extended release substance in capsule form.  The approved dosages were 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, and 50 mg.  The respective full capsule weights were 104 mg, 132 mg, 158 mg. 214 mg, 279 mg, and 340 mg.[74]  It follows that commencing October 6, 2014, there

---

[70]  *Id.* The FDA Orange Book listing includes the weight of the product combined with hydrocodone in the hydrocodone combination products.

[71]  See 79 Fed. Reg. 49661, 49680 (August 22, 2014) (to be codified at 21 C.F.R. pt. 1308).

[72]  The FDA approved 10 mg hydrocodone combination products include, almost uniformly, 325 mg acetaminophen.  There are surely other fillers as well.  Assuming conservatively that the weight of the 10 mg hydrocodone combination product is 335 mg, it will take approximately three such units to weigh one gram.  Thirty thousand such units would weigh 10,000 grams and under the Drug Equivalency Table would be equivalent to 5000 kilograms of marijuana.  This would produce an offense level 34 and, in criminal history category I, a sentencing range of 151 to 188 months imprisonment.  If such hydrocodone combination products were to remain schedule III substances with sentencing ranges measured by the number of "units," the offense level under the Drug Quantity Table would be level 18 and the criminal history category I sentencing range 27 to 33 months imprisonment.

[73]  See note 69, *infra*.

[74]  A representative of Zogenix Inc., the manufacturer of Zohydro ER, provided the full capsule weights to the writer in a telephone communication.

25

will be sentencing disproportions between hydrocodone combination products, previously classified as schedule III substances, and the Zohydro ER single entity products similar to the disproportions between the comparable Percocet and OxyContin products that produced the 2003 Sentencing Commission creation of "oxycodone (actual)."

A "hydrocodone (actual)" adjustment similar to the 2003 "oxycodone (actual)" adjustment would be equally inappropriate. Prescription opiates, unlike heroin "packages" distributed at the street level, are likely to identify the content of the active ingredient controlled substance in the carrier medium. The Drug Equivalency Table was initially designed to measure the various opiates against heroin. Perhaps the recent rescheduling of hydrocodone combination products will encourage the Sentencing Commission to reconsider the Drug Equivalency Table as it applies to opiate offenses. Given the current trend of increasing opiate abuse, it may well be appropriate for the Sentencing Commission to reconsider guideline ranges for offenses involving opiates. To the extent that the differing opiates warrant differing guideline sentencing treatment, as has been the historical case, the suggestion here is an equivalency measurement of the actual active ingredient content of prescription opiates, such as oxycodone and hydrocodone, in their numerous formulations against an "average" purity level of street level heroin packages.

# EXHIBIT B

The HONORABLE JUDGE PAUL A. CROTTY
United States District Court
Southern District of New York
500 Pearl Street Chambers 1350
New York, New York 10007

Re: <u>United States vs Michael Paulsen</u>
    Crim, No. 1:19-cr-00660-PAC

May 25, 2021

Dear Judge Paul A. Crotty:

My name is Michael Paulsen, I am the defendant in the case named above. I am writing you this letter to demonstrate my good character, besides the actions that I have unfortunately brought upon myself in this case. I am hoping you will find leniency towards my sentencing after reading how my actions do not determine the person I am.

My childhood began with my father leaving my mother when I was only five years old. My mother raised my sister and me, working odd jobs to make money. Unfortunately, my mother struggled for many years and collected public assistance to help keep food on the table. I was hired at my first job when I was fifteen years old and started to give my mother fifty dollars a week towards bills. I saw firsthand how it was to struggle from a young age, recalling a few times when the electric company shut off our power. I never wanted to struggle like my poor mother did to raise her children, so I continued to work hard. I was around thirty years old when I lost my mother to ovarian cancer. Losing my mother was devastating to me and my family. My mother supported and took care of us when my father left, I was an utterly lost soul. Moreover, my sister became pregnant at a young age and needed help raising my nephew Jaiden, which I continued to do up until a few years ago. I have always been there for my family, maintaining relationships and helping in any way needed. I have had a rough road and it is in no way an excuse for my actions that led me to this case, but possibly a reason why I chose an easier path which resulted in my poor choices.

I have always maintained a good work ethic even though I made some bad choices. I started my career at a young age, by first working at International Direct Communications, and then moving on to work at a Pharmacy, where I then went to school to obtain my Pharmaceutical Tech license. Additionally, I continued my studies at Cittone Institute, obtaining a help tech analyst license. This is where I met my fiancée Heather Cahill. I am close with my fiancée and her daughter ▇▇▇ Colgan. Since ▇▇▇ lost her biological father to a heart attack at a young age, I have maintained the role of a father figure. While Heather is at work, I help ▇▇▇ with

homework, take her to softball practice, pick her up from school, and bring her to the park. ███████ just turned ten and by me being incarcerated will break her and Heather's heart. I would love to continue my road to be a productive member of society, and by being incarcerated for a lengthy period I can't support my fiancée, her daughter, or myself. It will be detrimental to my finances, them, and my family.

In closing your honor, I have been reflecting on a lot since my arrest. I volunteer my time to Meals on Wheels, delivering food to the less fortunate on Staten Island. I am also friendly with a former customer from when I owned one of my businesses, Debra Fedora. She is an older lady and cannot get around, so I help run errands for her. I also try to attend Mass every Saturday or Sunday and maintain peace with God. I was raised as a Catholic and will continue to practice Catholicism. I am trying my best to maintain a positive attitude during this time, as I understand the consequences that I incurred on myself.  I strongly thank you for this opportunity to allow me to describe the kind of person I am. I urge you for your leniency on my sentence so I can get back to work and be with my family. Thank you for taking the time and consideration to read this letter, your HONOR.

Sincerely,

Michael P. Paulsen
Defendant

**LISAANN LOBRUTTO-MCGARITY, M.ED**

onthemtrain@gmail.com

6900 East Berneil Drive
Paradise Valley, Arizona
85253

602-617-4761

April 26, 2021

**The HONORABLE JUDGE PAUL A. CROTTY**
**United States District Court**
**500 Pearl Street Chambers 1350**
**New York, New York 10007**

Re:   ***United States vs. Michael Paulsen***
      ***Crim.No. 1:19-cr-00660-PAC***

Dear Judge Paul A. Crotty,

I respect that the court has found my cousin, Michael Paulsen guilty of illegal
distribution of Oxycodone. As a first cousin, I have known Michael all of his life and I
write today to offer a complete picture of who he is and how some of his choices
may have been influenced by a less than stellar upbringing. Please understand that
his experiences are not in any way meant to be excuses or justification for illegal
engagements. Michael has wholeheartedly accepted responsibility for his actions.
However, I do think Michael's story deserves some consideration as he is so much
more than his infractions.

When you speak of character, there is an implication of moral and ethical values. As
an Early Childhood Education Specialist, I am well aware that that the moral codes
of conduct are learned during the formative years between birth and five years of
age. As the frontal lobe continues to develop well into a young adult's life, critical
thinking skills are also shaped by the environment with which one resides and the
role models that are present during this period of growth.

As a toddler, Michael was uprooted from his home, along with his mother and infant
sister in the middle of the night by a US Court Marshal,  as the house they were
living in was not legitimately funded. Michael's father was the ultimate con artist,
leading a double life with another family in another state. Michael's young,
traumatized mother was forced to bring Michael and his infant sister to live with her
parents in a small, two-bedroom apartment in Brooklyn. Michael's grandmother was

bed-ridden with severe and debilitating rheumatoid arthritis. His grandfather, was a strict, loose cannon with a penchant for engaging in questionable activity on the streets of New York. Michael, from the age of 3 was often locked in a bedroom at my grandparents apartment, screaming to be let out, as his mother was unable to handle the difficulties of parenting due to her own trauma.

As my grandfather became the dominant "father figure" in Michael's life, he controlled much of Michael's daily activities and weighed heavily on his upbringing from then on. When your dominant role model is a man who encourages you to "sneak steaks" out of the grocery store by hiding them on the bottom of the shopping cart, you are clearly heading down a dangerous path. Michael never wanted to engage in these activities, but my grandfather ruled with an iron fist. When you are applauded and praised for behavior that is incorrigible, the lines between right and wrong become blurred. Even when Michael objected to unscrupulous behavior, he was often berated by our grandfather. I recall my grandfather saying on several occasions, "What's wrong with you Michael?"

Despite living in a stressful environment, Michael grew up doing all he could for our ailing grandmother. He would shop for her at the butcher, pick up her medications and run any errands that she needed. Michael was a straight A student and went on to graduate from New Utrecht High School in 1997. When his own mother could not work, Michael assumed the responsibility of contributing to the rent and caring for her as well. Shortly thereafter, Michael's unwed teen sister became pregnant. He assumed that responsibility as well, helping to provide for his sister and all of her baby's necessities. As a very young man, Michael now bore the financial burden of not just caring for himself, but also his mother, sister and her newborn. Michael was still a child himself and the burden was great.

Michael worked legitimately for many years in a neighborhood pharmacy. As a young teen, he would deliver prescriptions to the elderly and went on to acquire a pharmacy tech license from Kingsborough Community College. He was on the right path, but somehow was led astray. Never once has he denied his wrongdoings and I truly believe Michael is going to pay the ultimate price for his mistakes. Since his arrest, he has been sincere in his quest to turn his life around. For months, he has been spending his time delivering Meals on Wheels to those in need. He is also a very involved "father figure" to his significant other's daughter. He loves this child as his own, and they have a very dear relationship. Sadly, her biological father passed

away and Michael has tried his best to fill those shoes for this child. Michael picks her up from school, takes her to cheerleading practice and there is a strong bond between them. Just the other day, we were on a call and I heard her come out to the car and tell him, "I love you." It breaks my heart to think that she may lose another "father."

In closing, I just ask that you consider the many things this young man has done right in his life and that his time away will have a profound effect on a little girl. He was an amazing grandson to my grandmother, he was a wonderful son caring for his mother up until she passed from ovarian cancer. He has tried numerous times to help his sister start her life over and get on her feet. Michael knows he has done wrong. He is truly sorry and knows he must suffer the consequences of his actions. I ask that you find it in your heart to think of this man as someone's child. His own mother is not here to speak for him, so I speak on her behalf. He has always had a big heart. He is kind, respectful and well liked in the community. Michael can and will be a contributing member of society after he serves his time. Please be gracious in his sentencing.

Sincerely,

*LisaAnn LoBrutto-McGarity*

LisaAnn LoBrutto-McGarity, M.Ed.

The HONORABLE Judge Paul A Crotty
United States District Court
Southern District of New York
500 Pearl Street Chambers 1350
New York, New York 10007

Re:     United States vs Michael Paulsen
        Crim. No. 1:19-cr-00600-PAC

Dear Judge Paul A Crotty:

      My name is Heather Cahill, and I am a 40 year old bartender and a single mother to my daughter ████ Colgan. Michael Paulsen is my significant other. We met each other over 20 years ago, where we both attended the Cittone Institute a Lincoln Tech School. When we met Michael lived in a 1 bedroom basement apartment in Brooklyn with his mother and sister. Michael wasn't only going to school when I met him, he was also working full time for a Cellular phone Company in Brooklyn to support and take care of his family.

      Michael has always been there for me and my family willing to help out and lend a hand. An example of that is when we had a snowstorm last winter and the roads were terrible Michael dug out his car in Staten Island and drove 30 minutes to New Jersey where I reside with my daughter to shovel my car out because I had to get to work and I needed him to watch ████. He is always very thoughtful and is my rock whenever I need any type of support. Unfortunately 3 years ago ████'s father passed away tragically from a massive heartattack. Michael has been there for us through this emotional rollercoaster. He has done so much for me and ████. He brings ████ to school, helps her with her homework, brings her to her friend's houses and watches her when I need to go to work. He occasionally brings ████ to Meals on Wheels with him to teach her kind gestures and how he works for a non profit charitable organization. ████ looks up to Michael like a Dad. I honestly don't think I would of gotten through this without him. Michael's helpful nature also makes him my go to person in any situation or crisis that I may fare. This is going to be a very traumatic experience for ████ and myself.

      In addition Michael has a positive outlook on life and is a very respectful man. While it is unfortunate that he has made some bad decisions, thus resulting in this case, he is ready to accept responsibility for his actions. I believe as we move forward Michael will become a better person. He has expressed a deep sense of remorse during this time he has had to reflect on his actions, and has stated to me numerous times that he is sorry and regretful for everything he has done. I truly believe in his ability to pay his debt to society.

      It is my sincere hope that the Court takes my letter of recommendation into strong consideration on a lenient and merciful sentence on my significant other at sentencing. Despite this current case I believe Michael Paulsen to be an honorable, and loving individual with strong ties to the community. Thank you for taking the time out to read my letter Judge Crotty I appreciate it.

          Sincerely , Heather LeeAnn Cahill

          *Heather Cahill*

Madeline McNerney
1551 84th Street
Brooklyn, New York 11228
917-577-7651

May 25, 2021

**The HONORABLE JUDGE PAUL A. CROTTY**
**United States District Court**
**Southern District of New York**
**500 Pearl Street Chambers 1350**
**New York, New York 10007**

Re: *United States vs Michael Paulsen*

   *Crim No. 1:19-cr-00660-PAC*

Dear Judge Paul A Crotty,

   My name is Madeline McNerney, I am a Teacher for the Board of Education and specialize in Special Education. Having a Bachelors in Psychology and a Master's in Special Education, I am knowledgeable of the impact the environment and nurture have on child development. I would like to show how this impact had on Mr. Paulsen and how I exhibited that as his friend. This man came from a broken home, while his single mother struggled to provide. Mike lacked the guidance and support of a father but worked hard to help his mother. I have known Mike since our teenage years. I would like to give you a perspective of who this man is as a hard worker, family man, and model person in spite of his actions pertaining to this crime and why he should receive leniency in his sentencing.

   While Mike and I did not attend the same school, we grew up in the same neighborhood. I have always known Mike to be a hard worker. I recall as a teenager, Mike worked at International Direct Communications, right in the neighborhood of Dyker Heights where many of our friends grew up together on the same block. Coming from an Irish family in an Italian neighborhood, some frowned upon me and you could say I wasn't "in" with the crowd. Mike befriended me. In fact, Mike became a good friend through the years and I'm proud to say he is more like family.

   I remember Mike always helping his mother, even as an adult. He often cared for her, food shopping, cleaning her house, and taking her to lunch. In child development, this type of behavior shows compassionate compensation Mike felt he must do, since having an absent father leave his mother and make her fend for herself. His father left when he was younger, and Mike never spoke about him. Through Eric Erickson's psychosocial developmental stages, Initiative vs guilt, I believe Mike has been stuck in this stage for some time, always feeling he must do better to have a "purpose". This stage is followed by inferiority in, "how to be good". I think this is

where Mike lacked the confidence in such. Still, this does not result in the actions he has imposed upon himself. I can understand the contribution to why he thought at that time it was right. Mike even took care of his mom, when she was sick. It was hard to see Mike after his mom had passed away, he was so distraught. However, he still remained positive and smiled. It was from this young age Mike felt he must "take care" of everyone.

Moreover, these charges do not define Michael Pauslen. He is a hard worker and an avid learner. He graduated from Kingsborough as a Pharmacy Tech as well as receiving his help desk analyst degree from Cittone Institute. Mike has consistently strived to improve himself to do better in life. He is a provider to his family, as well as a full-time father figure to his fiance's daughter, ▮▮▮. Taking on the role of ▮▮▮'s father comes naturally to Mike. He does so many things in caring for her, and they bond as well. I can't imagine what she is feeling, knowing Mike will not be here for her future milestones.

Additionally, Mike is a kind, gentle man who puts others before himself. He is the first to help anyone. Maybe this is because he helped his mother his whole life. I remember him helping his sister Jennifer with her son, picking him up from school, and food shopping for her. Mike would never raise his voice or become angry, Even in times of despair. He is truly one of the nicest people I know.

Lastly, while given this is Mike's first offense, and with my description of him, I strongly feel a lesser sentence will be better imposed for the charges Mike has surrendered for. I am so glad to have had this opportunity to give you a description of this man I know. Please have mercy on Mr. Paulsen, my dear friend.

Thank you for your time and consideration.

Sincerely,

Ms. Madeline McNerney, M. Ed., Special Education

**AMBULATORY**
CONSULTING SERVICES

*Smart Business for Modern Healthcare*

May 1, 2021

**THE HONORABLE JUDGE PAUL A. CROTTY**
**United States District Court**
**Southern District of New York**
**500 Pearl Street Chambers 1350**
**New York, New York 10007**

Re:   **United States vs Michael Paulsen**
        **Crim. No. 1:19-cr-00660-PAC**

Dear Judge Paul A. Crotty,

My name is Jared Gaccione and I have known Michael Paulsen as an extended family member and friend for approximately 8 years.  I am proud to present this reference letter for your review.

In the time I have had the pleasure of knowing Michael, I have found him to be of the highest quality character.  While I neither condone nor agree with his decisions which led to the writing of this letter, nothing will change the respect I have for Michael as an individual.  I can say this with unreserved confidence having seen first-hand the strength and merit of his character.  The most notable attribute I can bring to your attention is his unrivaled commitment to his family, especially his stepdaughter.

The dedication he has shown in helping to raise his stepdaughter ████ is nothing short of inspiring.  Michael has risen to the challenge of being a loving father figure to ████, an amazing little girl who recently lost her father.  Michael has accepted this responsibility and proven to be a doting parent and provider to ████.  Having shown such a true commitment to his family is the greatest example of the strength of his character.

This is the Michael Paulsen I know.  The Michael Paulsen I am proud to be friends with.  Michael's past indiscretions do not define the man, father, brother, son, and friend that he is.  He is so much more than can be described in such a short letter.

I thank you for taking the time to read my honest opinion about Michael.  Should you have any questions regarding the aforementioned details, or if you should require additional information regarding my relationship with Michael Paulsen, please do not hesitate to contact me directly at 732-245-8141 or via email at JaredG@AmbulatoryConsulting.com .  I would welcome the opportunity to further discuss Michael's character with you.

Sincerely

Jared Gaccione
Managing Partner

**AMBULATORY**
CONSULTING SERVICES

*Smart Business for Modern Healthcare*



# MEALS ON WHEELS OF STATEN ISLAND, INC.

304 PORT RICHMOND AVENUE
STATEN ISLAND, N.Y. 10302
Telephone: (718) 727-4435
Fax: (718) 727-2157
www.mealsonwheelsofsi.org

**OFFICERS:**

Mark Russo
*Chairman*

Michael Assenza
*Vice-Chairman*

Christopher Rubano
*Treasurer*

Jean R. Ringhoff
*Secretary*

Anthony Danna, Esq.
Eric Feldmann
Mary-Beth Francis
*Members at Large*

**DIRECTORS:**

Thomas Beyer
Sheldon Blackman, PhD
Michael Bloomfield
Barrington Burke-Green
Linda Duane, MSRD
Emil P. Galante
Steven V. Gattullo
Annamarie Gulino-Gentile, Esq.
Richard Grado
Jeff Henick
Gary LiGreci
Edwina Frances Martin, Esq.
Manjula Vara-Patel, M.D.
Pankaj Patel, M.D.
Michael Scamardella
Liz Scarano
Rosemarie Stazzone, RN, MS
Mark Tranchina

William J. Frew, Jr., Esq.
Olga Gaeta
Linda Walsh
*Emeritus*

Joseph Tornello, LCSW
*President/CEO*

April 26, 2021

Re:  **Michael Paulsen**

To Whom It May Concern,

The mission of Meals on Wheels of Staten Island is to provide two nutritious meals each day to the homebound elderly who are unable to shop for or prepare their own meals.

**Michael Paulsen** began volunteering with Meals on Wheels of Staten Island on November 30, 2020, delivering meals once per week to socially isolated seniors who rely on Meals on Wheels as their only source of nutrition.  **He has accumulated 45 service hours for his efforts, through April 26, 2021.**

**Mr. Paulsen's** service is particularly appreciated because without volunteers like him, who stepped up during the COVID-19 pandemic, we would have been greatly challenged to continue to feed 1300 seniors each day. His service speaks highly of his character and compassion for his elderly Staten Island neighbors.

Sincerely,

Roseann Holt, CVA
Vice President

Edwin and Tracy Larsen
769 Holmdel Rd, Holmdel NJ 07733
(732)-778-5485

Dear Honorable Judge Paul A. Crotty,

I have had the opportunity to meet Michael and have been family and friends for almost 20 years.  I can speak to you with authority about the moral condition of Michael, and I hope your good faith will take into account this brief letter when you have to make your wise decision.

In summary, Michael is a great person and an excellent friend. At all times, since I met him, he has shown to have a generous, kind, and devoted character towards others. He is a person with a lot of integrity and really makes a great effort to make sure that he acts correctly at all times. Michael is a person who has a great sense of duty that has always been shown to the other members of his community, his family, and friends.

I can truly understand how difficult it is for you to have to make a decision of this type and under these circumstances, without really knowing the person in front of you, but I trust in God that you can look at this letter and feel All the support that the family and friends of Michael are trying to provide you. All this in order to tell you that we trust your wise decision, always considering the best for everyone.

Sincerely,

Signature _____   Date: 5/13/2021

Edwin and Tracy Larsen

Court Reference Letter

Steven and Nancy Bond
13 Weston Pl, Aberdeen NJ 07747
(732)-207-7323
sbond@itcloudconsult

Dear Honorable Judge Paul A. Crotty,

My name is Steven Bond, and my wife Nancy are proud to offer our recommendation of Mr. Michael Paulson to whom we have personally known for over 20 years as an extended family member.

During our time knowing Michael, we have experienced and seen an individual who is a hard-working family man. Michael has always carried himself as very polite and respectful to all people he was surrounded with. In addition, Michael is a family-person that has been a father figure and role model to his stepdaughter ███ Colgan. It will be very heartbreaking for ███ who loves Michael as a dad in which she has lost her biological father only a few years ago.

While it is unfortunate that Michael has made some bad decisions, thus resulting in this case, we strongly believe that he has moved forward and has shown through his efforts that he will emerge an even better person. In short, Michael has expressed deep sense of remorse in making such a serious mistake and we believe in his ability to pay his debt to society.

It's with great confidence that we recommend Michael Paulson as someone who we truly believe in. He possesses the character and judgement for the better of our community and most importantly as a loving and caring father.

It is my hope that the court takes note of this letter of consideration at the time of sentencing for Michael.

Please do not hesitate to contact me if you should require any further information.

Sincerely,

Signature_____ Date: _____

Steven and Nancy Bond

Carla Ann Stasio
48 Merle Place
Staten Island, NY 10305
917-577-7651

May 26, 2021

**The HONORABLE JUDGE PAUL A. CROTTY**
**United States District Court**
**Southern District of New York**
**500 Pearl Street Chambers 1350**
**New York, New York 10007**

Re: *United States vs Michael Paulsen*
    *Crim No. 1:19-cr-00660-PAC*

Dear Judge Paul A Crotty,

    My name is Carla Ann Stasio, and I work for Maimonides Hospital in Brooklyn. I have known Michael for 27 years. We attended the same Elementary school together, as well as grew up in the neighborhood. Mike is more than just a friend, he is family. While the Federal Court has found him guilty of these crimes, I can't seem to understand this is the same man going to Prison. No matter what it does not change the fact that Michael incurred these actions on himself, but this is not the Michael I know.

    When we were younger, growing up Michael had a hard time helping his mom. He always cared for her, worried about her and his sister. Michael worked hard in school, going to New Utrecht, he maintained straight A's, I would call him a nerd. He loved to read! While we went to school, I started working for the Hospital, Mike worked in a Pharmacy, going to Kingsborough, obtaining his Pharmaceutical Tech license.

    When I had my first child, Mike filled out her card and signed it "Uncle Mike". To this day, my kids look up to him as Uncle Mike. He always is at family functions and holidays. I consider him such a great friend. I can't imagine he now must face time in Prison for mistakes he committed.

    Thank you for allowing me the chance to describe to you the man I know.

Sincerely,

Carla Ann Stasio

**From:** Chrissy Lyons <chrissy7713@gmail.com>
**To:** mikeybksts@aol.com
**Date:** Tue, May 25, 2021 9:11 am

Christine Lyons
4198 Cherry Lane Church Road
Henryville, Pennsylvania18332

The HONORABLEJUDGE PAUL A. CROTTY
United States District Court
Southern District of New York
500 Pearl Street Chambers 1350
New York, New York 10007

May 10, 2021

Re:  _**United States vs. Michael Paulsen**_
_**Crim. No. 1:19-cr-00660-PAC**_

Dear Judge Paul A. Crotty:

I have known Michael Paulsen as a good friend for over 26 years. I was troubled and surprised to hear about this case as he has always been an extremely moral, caring and responsible person and friend. For this reason, I am happy to write a letter of reference regarding this matter. I completely understand the seriousness of this matter, however, hope the court will show some leniency.

Mr. Paulsen has always been an upstanding member of the community. He is the type of person to give a stranger the shirt off his back. He has volunteered at numerous organizations over the years, such as Meals on Wheels. He has also made numerous donations to the National Ovarian Cancer Coalition Fund. That charity is very close to his heart because unfortunately his mother passed away from ovarian cancer in 2010.

In our friendship, he has always been a constant, positive support for me. Anytime I needed a friend or was going through a difficult time he always was one of the few people who always made it a point to be there and show a significant amount of support in any way I needed. He has truly been an amazing friend over all of these years. I can honestly say that I consider him family.

It is unfortunate that he has made some bad decisions which have resulted in this case. I was extremely surprised to hear of this misconduct, but am positive that he is ready to accept responsibility for his actions. I believe that from this situation he will emerge a better person. He has expressed a deep sense of remorse in making such a serious mistake and I believe in his ability to pay his debt to society.

It is my sincere hope the court takes this letter into consideration at the time of sentencing. Despite this current case, I still believe Michael Paulsen to be an honorable individual, a valuable member of the community and a great human being.

Very truly yours,


Christine Lyons

31 Firethorne Circle
Red Bank, N.J. 07701
May 02, 2021

Dear Judge Paul A. Crotty,
Unfortunately it is necessary to earnestly request, for a heart-felt judgement of concern on behalf of our nephew, Michael Paulsen.
He has called me "Aunt" Corinne continously from early childhood, onto his adult life. Michael has impressed me by striving to be successful, even though life has dealt him a tough and difficult childhood. His father deserted his family at the young age of 6. As a teenager he realized he had to take on the role of "man of the household." The responsibility of supporting his mother and younger sister was his primary concern and also seeking a job, was a

a difficult task for a young man. Nevertheless, his good natured attitude enabled him by being helpful, thoughtful, generous and most of all, responsible towards anyone who depended on, and knew Michael.

It is unbelievable that his character, would be accused of such a dreadful misfortune. Confining him to imprisonment is a devastating purpose to his existance — Michael would "waste away"! I am requesting of you, to look upon his situation and pass a judgement upon Michael, with lenient consideration.

In addition, enclosed you will find a small album of photos. Glance through them and feel assured that he is, was and always will be, regrettably SORRY. needlessly, to say, that his mistake in life, is an act



that has taught him a great and everlasting lesson. never to be repeated again. I don't know, if you can ask for more than that!

Respectfully,
Corinne & Carlo
LoBrutto
(aunt & Uncle)

The HONORABLE JUDGE PAUL A. CROTTY
United States District Court
Southern District Of New York
500 Pearl Street Chambers 1350
New York, New York 10007

Re:   United States vs Michael Paulsen
       Crim. No. 1:19-cr-00660-PAC

Dear Judge Paul A. Crotty,

My name is Anthony LoBrutto, I am 52 years old Senior Market Advisor
employed by a local credit union in Phoenix, Az. Michael Paulsen is my 1ˢᵗ
cousin and we grew up together in Brooklyn, NY. Michael's mother was
the primary caregiver for him and his sister Jennifer as his father
unfortunately was not involved with his children from a very young age.
As Michael grew older, he found it his responsibility to help care for his
mother and sister.  My Aunt Marie, Michael's mother, was stricken with
cancer at a young age and unfortunately lost her battle, but during that
arduous time Michael went with her to the Dr's, hospital, etc. and
basically took full responsibility for her care while still working full time
as a pharmacy technician.

Michael ended up wondering down a path of easy money, but also realized
that he needed to help take care of his family. Not having the guidance of a
father figure, though certainly not an excuse to break the law, I believe had
a profound effect on Michael's life. Michael is a good man who would
give the shirt off his back to help someone in need. He helps raise his
girlfriend Heather's 10yo child, ███████, who lost her Dad tragically a few
years ago. ███████ looks up to Michael as a Dad, though he could never
replace her father, he takes responsibility in taking her to school, friends
houses, often has her friends at his house, helps her with homework, and
helps take care of her when Heather works. I truly believe Michael not
being in her life will be traumatic for her.

I see Michael about 2 or 3 times a year because of the distance between us,
but we speak regularly. He has a positive outlook on life and as you will
come to see, he is an extremely respectful man. He fully understands that
what he did was wrong and has accepted responsibility, but instead of
making excuses he is trying to focus on what he can do to earn an honest
living and be a good, productive member of the community. Much of our
conversation focuses around different types of career paths and
opportunities for him, he's very appreciative of having a second chance.

In all sincerity, I hope the court will see Michael as I have tried to explain him here and offer him leniency. Despite his current situation, I honestly believe my cousin Michael Paulsen to be an honorable man that provides love, security, and guidance to his girlfriend Heather, but more importantly to this 10yo child. Michael is a good human being and once again, I believe, can do good deeds with his life.


Sincerely,


Anthony G LoBrutto

*LAW OFFICES OF*

# MURRAY RICHMAN

*and Associates*

2027 Williamsbridge Rd., Bronx, NY 10461
Tel (718) 892-8588 | Fax (718) 518-0674
mrichman_mr@msn.com

May 3, 2021

The Honorable Paul A. Crotty
District Court Judge
Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

RE: ***United States v. Michael Paulsen***
1:19-cr-00660-PAC-1

Dear Judge Crotty:

I write this letter on behalf of Michael Paulsen who to the best of my knowledge is scheduled for sentencing on June 16, 2021, for a serious crime of dispensing Oxycodone.

I hesitated to write this letter because of the nature of the charge, however, I know Michael and I know this to be an apparition. He is totally a decent human being that I cannot fathom him having committed this wrongdoing and I have no doubt that he has done so. I do believe that he should be given the maximum consideration. Just to know him is to recognize the fact that he is a decent human being and has learned from this experience.

I urge you to give him every consideration possible. I have not known him a very long time, but I have known him sufficiently and interacted with him sufficiently to get an understanding of the man. I also know that this court is fair minded and would give him every possible consideration and I urge you to do so.

Respectfully submitted,

MURRAY RICHMAN

MR/cs



# OUR LADY HELP OF CHRISTIANS CHURCH

7396 AMBOY ROAD, STATEN ISLAND, NEW YORK 10307

Tel: 718-317-9772

## Certificate of Sponsor Qualification

Name of Sponsor _Michael PAULSEN_

Home Address _94 FINLAY STREET_

Phone # _929-202-1541_

Name of Person being Sponsored _____

Baptism_____       Confirmation_____   (please check one)

Parish of Ceremony_____   Date of Ceremony____/____/____

*I, the undersigned Sponsor, certify that I am an active registered parishioner of Our Lady Help of Christians Parish in Tottenville, Staten Island, New York. As a sponsor, I understand that I am called to be an example of lived Catholic faith for whom I stand, professing the teaching of the Catholic Church and living them to the best of my ability. I further testify that I am qualified to serve as a sponsor because I meet all the necessary requirements under the Code of Canon Law as listed below:  (initial each one)*

- _✓_ Am a fully initiated member of the Catholic Church, having received the Sacraments of Baptism, Eucharist, and Confirmation
- , _____ If married, was married within the Catholic Church or with dispensation from the Church.
- _✓_ Am at least 16 years of age
- _✓_ Am not the mother or father of the person sponsored
- _____ Am not under any canonical penalty
- _✓_ Am living a morally good life

Signature of Sponsor _Michael Pale_ _____   Date _5 / 11 / 21_

*I, the undersigned ecclesiastical representative, hereby certify that to the best of my knowledge this person is capable of assuming the duties of a sponsor.*

Parish Seal Below

_____   Date _5 / 11 / 21_
Priest/Deacon

A Roman Catholic Faith Community in Tottenville Since 1898

# EXHIBIT C

Case 1:19-cr-00660-PAC   Document 42   Filed 08/30/21   Page 62 of 76



Alexander S. Bardey, M.D.
Kate Termini, Psy.D.

## FORENSIC-PSYCHIATRIC EVALUATION

### MICHAEL PAULSEN
### Indictment No.: 19 Cr. 660

### July 23, 2021

Joseph Sorrentino, Esq.
Menicucci Villa Cilmi, PLLC
404 Manor Rd
Staten Island, NY, 10314

Dear Mr. Sorrentino,

At your request, I performed a psychiatric evaluation of your client, Mr. Michael Paulsen, a 42-year-old male who pled guilty to conspiring to distribute and possess with the intent to distribute oxycodone between March 2016 and September 2019.[1] The purpose of the examination was to assist you in gaining a better understanding of any underlying psychological factors that could be considered mitigating in the disposition of this case. The examination took place via Zoom, a secure video-conferencing platform, on June 25, 2021, July 9, 2021, and July 19, 2021.

In conducting this psychiatric evaluation, I reviewed Mr. Paulsen's personal, social, educational, vocational, and psychiatric histories, and I reviewed his understanding of the circumstances that led to his legal troubles. I performed a mental status examination in order to assess Mr. Paulsen's intelligence, thought processes, cognitive functioning, memory, credibility, orientation, judgment, insight, and impulse control. The limits of confidentiality inherent to such an evaluation were explained to Mr. Paulsen.

The *Personality Assessment Inventory (PAI)* and the *Millon Clinical Multiaxial Inventory-III (MCMI-III)*, both of which are psycho-diagnostic tests designed to shed light into Mr. Paulsen's enduring personality traits and current emotional functioning, were administered on July 9, 2021 and July 19, 2021, respectively. The *Trauma Symptom Inventory-2 (TSI-2)* was also

---

[1] US Department of Justice, Plea Agreement, dated 3/4/2021

303 Fifth Avenue, Suite 403, New York, NY 10016
212-532-2322.  info@fifthavenueforensics.com

administered on July 9, 2021 to assess the degree of impact of traumatic events on Mr. Paulsen's collective functioning.

In addition to my examination, I conducted collateral interviews via telephone with Mr. Vincent Paulsen, Mr. Paulsen's half-brother, and Ms. Heather Cahill, Mr. Paulsen's girlfriend, on July 20, 2021 and July 21, 2021, respectively.

Lastly, I reviewed the following documents in making my assessment:

1. US Attorney's Office Southern District of New York, press release, dated 9/12/19
2. US Department of Justice, Plea Agreement. 3/4/21
3. Character Letters, various sources, dated 4/26/21 to 5/26/21
4. US District Court for the Southern District of New York, Presentence Investigation Report, dated 6/14/21
5. United States of America v. Michael Paulsen, Indictment, undated

# PAST PERSONAL HISTORY

Mr. Michael Paulsen is a 42-year-old Caucasian male born on September 7, 1978 in Brooklyn, NY. Mr. Paulsen reported that he was raised in Staten Island, NY by his mother, Ms. Maria Paulsen, and father, Mr. Paul Paulsen, until his father "abandoned" the family when Mr. Paulsen was four years old. According to Mr. Paulsen, his parents "argued a lot" because of his father's drinking and gambling prior to their separation. Following his father's departure, Mr. Paulsen's mother worked various jobs to support their family while also receiving government assistance and food stamps.[2] Mr. Paulsen reported that he was born approximately eight weeks premature and was sustained in an incubator for the first two weeks of his life. He posited that this may have been the result of his mother's smoking habit during her pregnancy. In 2009, Mr. Paulsen's mother died of ovarian cancer at the age of 65. Additionally, Mr. Paulsen has one sister, Ms. Jennifer Paulsen, who currently resides in a homeless shelter and suffers from depression.

Mr. Paulsen further reported that his father worked in telecommunications and had three sons, Vincent, Daniel, and Paul, and one daughter, Katherine, from a previous relationship. Mr. Paulsen endorsed a positive relationship with his three half-brothers, but reported that he has not spoken to his half-sister since his arrest. He explained that his father died in 2007 at the age of 63 due to chronic alcoholism. He added that his half-brother, Paul, has also suffered from drug addiction for decades.

Mr. Paulsen described having a difficult relationship with his father, who was "in and out of my life since I was a child." When he was four years old, Mr. Paulsen explained, his father said that he was going out to buy beer and cigarettes and did not return home for weeks.

---

[2] US District Court for the Southern District of New York, Presentence Investigation Report, dated 6/14/2021

*Forensic-Psychiatric Report*
*Michael Paulsen*

In fact, his father never permanently returned home and was an inconsistent presence in Mr. Paulsen's life from that point on. Mr. Paulsen reported that his father would return home "out of the blue" over the years and spend an evening with Mr. Paulsen and his sister before leaving again for an indeterminate amount of time. This pattern of intermittent interaction continued throughout most of Mr. Paulsen's childhood and adolescence. Mr. Paulsen posited that his father desired more freedom and "could not handle" the responsibility of raising children, as he dealt with ongoing alcohol and gambling issues throughout his life.[3]

When Mr. Paulsen was 16 years old, his father learned his cell phone number from one of his half-brothers and began contacting him directly. Mr. Paulsen's mother discouraged him from rekindling his relationship with his father, arguing that "he didn't want to raise you...he just wants a drinking buddy now." Nevertheless, Mr. Paulsen decided to visit his father at his new home in California. He subsequently discovered that his father had remarried in California despite still being legally married to Mr. Paulsen's mother in New York. At that time, Mr. Paulsen recalled, his father "begged" him for money to pay his rent, and Mr. Paulsen "scraped up $1,200 to lend him." However, his father then stopped contacting him and never paid him back. Two years later, Mr. Paulsen reported, his father returned to New York City and the two got back in touch. One day, Mr. Paulsen's father called to ask to borrow his car, which Mr. Paulsen refused to allow because his father often "drank too much." Mr. Paulsen reported that his refusal angered his father, who cursed at him and abruptly hung up the phone. That conversation would prove to be the pair's last communication, as his father was found dead on his living room floor "next to a cheap bottle of liquor" shortly thereafter. Mr. Paulsen's father was given a free cemetery plot due to his service in the Vietnam War, but Mr. Paulsen has only visited the site once, as he still struggles with conflicting emotions toward his father to this day.

Mr. Paulsen attended St. Ephrem Catholic Academy in Brooklyn, NY for first and second grade before switching to public school due to his family's financial difficulties. He was subsequently enrolled at PS 229 for grades three through five, a transition which he reported was "tough" at first because he had to leave his friends behind. That said, Mr. Paulsen reportedly adjusted well after a few months. He then advanced to Dyker Heights Intermediate School for grades sixth through eight before attending New Utrecht High School. At that time, Mr. Paulsen reported, he started "hanging out with sort of a bad crowd," experimenting with marijuana, and skipping school. As a result, he graduated from high school six months later than expected in January 1997.

Mr. Paulsen also attributed his poor performance in school to his maternal grandfather's influence. According to LisaAnn Lobrutto-McGarity, M. Ed., when Mr. Paulsen was a toddler, his family was suddenly uprooted from their home in the middle of the night by law enforcement when it was discovered that Mr. Paulsen's father had illegitimately funded the home.[4] The Paulsen family subsequently had no choice but to move in with Mr. Paulsen's

---

[3] US District Court for the Southern District of New York, Presentence Investigation Report, dated 6/14/2021
[4] Character Letter from LisaAnn Lobrutto-McGarity, M. Ed., dated 4/25/2021

*Forensic-Psychiatric Report*
*Michael Paulsen*

maternal grandparents. Mr. Paulsen characterized his grandfather as a "traditional Italian guy" who was "slightly abusive," and explained that his grandfather often slapped him, his mother, and his grandmother over minor slights such as dropping food or being late to dinner. The Paulsen family moved out after approximately one and a half years, once Mr. Paulsen's mother could no longer stand to live there. However, Mr. Paulsen's grandfather remained a major part of his upbringing even after their departure.

When he was 12 years old, Mr. Paulsen reported, his grandfather began taking him to bars where he conducted his "loan shark" business. His grandfather reportedly encouraged him to learn the business himself so that he could support his mother in his father's absence. By the time Mr. Paulsen was 15 years old, his grandfather began removing him from school and bringing him to grocery stores, from which he encouraged Mr. Paulsen to steal. According to Mr. Paulsen, his grandfather claimed that taking food from a grocery store was not stealing because "the supermarket has enough f-cking money." Mr. Paulsen's grandfather taught him to sneak steaks and cases of beer out of the store in the bottom of shopping carts and rewarded him with money when he did so successfully. Mr. Paulsen acknowledged that his grandfather "instilled bad things in me in that sense." He further reported that he witnessed his grandfather physically attack individuals who owed him money and heard him speak poorly of family members who were not "hustling" in the same way he was. This further encouraged Mr. Paulsen to comply with his grandfather's illegal activity for fear of being "beat" if he refused to do so.

Mr. Paulsen's involvement in his grandfather's money lending business continued to increase as he got older, as his grandfather began enlisting him to pick up money from his associates on his own when he was 17 years old. However, when Mr. Paulsen was 18 years old, his grandfather passed away. Mr. Paulsen explained that, "[my grandfather] was like a father to me...I took that a little hard." At the funeral, Mr. Paulsen reported, a man approached him and gave him $500 that had been owed to his grandfather. Thereafter, Mr. Paulsen briefly took over his grandfather's "business."

Mr. Paulsen also described the influence that his older half-brother, Paul, had on his upbringing. According to Mr. Paulsen, Paul has been incarcerated three times for theft and once robbed a jewelry store "in broad daylight." As a preteen, Mr. Paulsen reported, he was "confused" by illegal behavior in general because, while he knew it was wrong, he "saw all the benefits of people doing it," such as Paul making money and his grandfather rewarding him when he successfully stole from grocery stores. When Mr. Paulsen was 18 years old, he and Paul went to a mall together the day after Paul was released from jail. Paul reportedly tried on articles of clothing, ripped off the tags, and stole them. This created further confusion for Mr. Paulsen, as his brother's immediate return to illegal activity caused him to question whether he had "learned his lesson" or "if there was a lesson to learn." Mr. Paulsen admittedly "started following in [Paul and his grandfather's] footsteps" in his late-teen years, as he began stealing from drug stores and selling the items to help his mother pay rent. At the age of 17, Mr. Paulsen was arrested after stealing from a Macy's department store in the Staten Island Mall. He was charged with a misdemeanor and required to complete community service.

*Forensic-Psychiatric Report*
*Michael Paulsen*

After the death of his grandfather, Mr. Paulsen reported, he continued living with his mother and sister in a small, one-bedroom apartment. He recalled that the family struggled financially and often received notices from the electric company regarding late payments.[5] Mr. Paulsen's grandfather had previously given his mother about $350 each month for her rent, so Mr. Paulsen began working two jobs in order to continue supporting her. He reportedly worked 11-hour days for two years before enrolling at Lincoln Technical Institute in Woodbridge, NJ to earn certification as a computer help desk analyst. After completing a one year program at Lincoln, Mr. Paulsen briefly worked as a help desk analyst. He then left that field to work at his brother-in-law's cell phone company in 2003. Shortly thereafter, Mr. Paulsen was recruited to work at a friend's newly opened pharmacy. He maintained employment there on Mondays and Tuesdays while working at the cell phone store on Wednesdays through Saturdays for the next five years, at which time Mr. Paulsen stopped working at the cellphone store and began working at the pharmacy full time.

In 2010, Mr. Paulsen was arrested for a second time when a pharmacy customer asked him to deliver a prescription of 120 oxycodone pills to a Dunkin Donuts parking lot. Mr. Paulsen admittedly obliged the request and handed the customer a bag of pills in exchange for a large amount of cash. According to Mr. Paulsen, he had lent the customer approximately $1,000 a few months prior to this meeting, and the large amount of cash included that repayment as well as the $50 co-pay for the medication. A police officer reportedly witnessed the transaction and "thought something shady was going on." Mr. Paulsen was subsequently arrested, but the case was later dismissed. He continued to work at the pharmacy until approximately 2015, at which time it was sold to a new owner, leaving Mr. Paulsen unemployed for approximately eight months. He then decided to open his own pharmacy in Staten Island, which he operated from March 2016 until his arrest in September 2019.

Mr. Paulsen characterized his life between 2000 and 2010 as "hard...physically, emotionally," as he worked long hours at two jobs and cared for his mother, all while attempting to manage his relationship with his sister, Jennifer. According to Mr. Paulsen, Jennifer was involved in multiple abusive relationships, using illicit drugs, and in and out of homeless shelters while raising her young son, Jayden. In 2009, Mr. Paulsen's mother passed away from ovarian cancer, a loss which was "very upsetting" to Mr. Paulsen as the two had always been "very close." Mr. Paulsen subsequently got an apartment of his own, which his sister requested to live in. Due to her ongoing drug abuse, Mr. Paulsen refused to allow his sister to stay with him, although he did agree to take Jayden in. Mr. Paulsen reported that Jayden did "pretty good" while in his care for five months. However, when Jayden's father finished a stint in rehab, he removed his son from Mr. Paulsen's home. This was yet another devastating loss for Mr. Paulsen, as he had grown very close to his nephew during that time. Mr. Paulsen reported that his contact with his nephew has been extremely limited in the years since.

---

[5] US District Court for the Southern District of New York, Presentence Investigation Report, dated 6/14/2021

*Forensic-Psychiatric Report*
*Michael Paulsen*

Of note, Mr. Paulsen endorsed experiencing a number of psychiatric symptoms before, during, and after the instant offense. He reported that he sometimes experiences racing thoughts, anxiety, and sleep disturbance in response to stress. In fact, Mr. Paulsen reported that, "every couple weeks," he "has tons of energy" and does not have a need for sleep at all. Additionally Mr. Paulsen endorsed experiencing intrusive flashbacks of his mother dying in the hospital and of his half-brother, Vincent, trapping him in the closet at their grandfather's house when he was approximately five years old. Lastly, Mr. Paulsen expressed that he sometimes feels as though he possesses two personalities, one being a "very humble, nice going guy," and the other being "very moody."

## RESULTS OF PSYCHOLOGICAL TESTING

### Personality Assessment Inventory (PAI)

On July 9, 2021, Mr. Paulsen was administered the *Personality Assessment Inventory* (PAI), authored by Leslie Morey, Ph.D., which is a multi-scale pen and paper test of psychological functioning that assesses constructs relevant to personality and psychopathology evaluation in various contexts including psychotherapy, crisis/evaluation, and forensic assessment. The PAI has 22 non-overlapping scales, providing a comprehensive overview of pathology in adults. The PAI contains four kinds of scales: validity scales, which measure the respondent's approach to the test, including faking good or bad, exaggeration, or defensiveness; clinical scales, which correspond to psychiatric diagnostic categories; treatment consideration scales, which assess factors that may relate to treatment of clinical disorders or other risk factors but which are not captured in psychiatric diagnoses; and interpersonal scales, which provide indicators of interpersonal dimensions of personality functioning.

Mr. Paulsen's PAI profile indicates that he attended appropriately and responded consistently to the content of test items. His response patterns indicate a defensiveness about particular personal shortcomings, as well as an exaggeration of certain problems.[6] Additionally, there are indications that Mr. Paulsen consistently endorsed items that portray himself in an especially negative or pathological manner, possibly reflecting a "cry for help" or an extreme negative evaluation of oneself. Although not necessarily deliberate, Mr. Paulsen's test results potentially involve considerable distortion and may not be an entirely valid reflection of his objective clinical status. That said, the following interpretation is instead an indication of Mr. Paulsen's self-description.[7]

The configuration of clinical scales show significantly marked elevations across several scales, which indicates a broad range of clinical features, increasing the possibility of multiple diagnoses. Profile patterns of this type are typically associated with marked distress and severe impairment in functioning is typically present. In Mr. Paulsen's case, these scales suggest that

---

[6] PAI, Clinical Interpretive Report, administered 7/9/2021, p.8
[7] PAI, Clinical Interpretive Report, administered 7/9/2021, p.8

*Forensic-Psychiatric Report*
*Michael Paulsen*

he is a person with low energy and significant tension, unhappiness, and pessimism.[8] Past and present stressors have likely adversely affected his self-esteem, causing him to view himself as powerless to change the direction of his life. He also reports difficulty concentrating and making decisions.

Mr. Paulsen reports a number of difficulties consistent with a significant depressive experience. He is likely plagued by thoughts of worthlessness, hopelessness, and personal failure. He openly admits to feelings of sadness and a loss of interest in normal activities.[9] Additionally, Mr. Paulsen indicates that he is experiencing specific fears or anxiety surrounding some situations and he is likely to display a variety of maladaptive behavior patterns aimed at controlling that anxiety. Perhaps related to this, Mr. Paulsen may have experienced a disturbing traumatic event in the past that continues to distress him. He is probably a fairly rigid individual who may fear his own impulses and doubt his ability to control them. Others likely consider Mr. Paulsen a perfectionist and notice his overconcern regarding issues and events over which he has no control.[10]

Mr. Paulsen describes a personality style with numerous problematic personality traits. He appears uncertain about major life issues, and this uncertainty likely extends to the arena of interpersonal relationships, as he may have a very unstable sense of what he desires from these interactions.[11] He may tend to be preoccupied with consistent fears of being abandoned or rejected by those around him and likely has a history of involvement in intense and short-lived relationships as a result. He is likely viewed as hypersensitive, hostile, and unforgiving as he is quick to harbor strong feelings of resentment as a result of perceived slights and insults.[12]

Mr. Paulsen's personality style is also consistent with a number of antisocial character features which may have manifested a conduct disorder during adolescence.[13] Additionally, he describes certain problems associated with elevated and variable mood. His self-description indicates significant suspiciousness and hostility in relations with others, and his self-concept appears to be poorly established, varying as a function of the current status of close relationships. As a result, his self-esteem is quite fragile and likely to plummet in response to slights or oversights by other people.[14]

According to his response style, Mr. Paulsen's interpersonal style can be best characterized as "somewhat distant and withdrawn in personal relationships."[15] Although others may view him as reserved and aloof, he is more likely to perceive himself as being shy. While valuing his independence, he is nonetheless concerned about how others perceive him.

---

[8] PAI, Clinical Interpretive Report, administered 7/9/2021, p.8
[9] PAI, Clinical Interpretive Report, administered 7/9/2021, p.9
[10] PAI, Clinical Interpretive Report, administered 7/9/2021, p.9
[11] PAI, Clinical Interpretive Report, administered 7/9/2021, p.9
[12] PAI, Clinical Interpretive Report, administered 7/9/2021, p.10
[13] PAI, Clinical Interpretive Report, administered 7/9/2021, p.9
[14] PAI, Clinical Interpretive Report, administered 7/9/2021, p.10
[15] PAI, Clinical Interpretive Report, administered 7/9/2021, p.10

*Forensic-Psychiatric Report*
*Michael Paulsen*

Further, Mr. Paulsen likely views his current social support as being somewhat lower than that of the average adult.[16]

With respect to anger management and suicidal ideation, Mr. Paulsen did not report any distress or difficulty in either area. That said, his responses indicate an acknowledgement of important problems and a positive attitude towards receiving help in dealing with these problems. He appears to have substantial interest in making changes in his life and he appears motivated for treatment. Despite this favorable sign, his results also suggest a number of possible challenges to his treatment process, including defensiveness, difficulty placing trust in treating professionals, and difficulty expressing his emotions.[17]

Lastly, Mr. Paulsen's testing results suggest possible diagnoses of major depressive disorder, single episode, unspecified; posttraumatic stress disorder; and bipolar II disorder.[18]

## Trauma Symptom Inventory-2 (TSI-2)

On July 9, 2021, Mr. Paulsen was also administered the *Trauma Symptom Inventory-2 (TSI-2)*, which is designed to measure acute and chronic trauma-related symptoms and behaviors. The TSI-2 is comprised of 136 items, two validity scales, 12 clinical scales, 12 subscales and four factors all of which assess a wide range of potentially complex symptomology associated with posttraumatic stress, traumatic losses, and/or other trauma.

As previously mentioned, there are two validity scales built into the assessment, the Response Level (RL) scale and the Atypical Response (ATR) scale. Both Mr. Paulsen's RL and ATR scores were within acceptable limits.

Mr. Paulsen's responses indicate significantly elevated scores on clinical subscales "defensive avoidance," "dissociation," "impaired self-reference," and "reduced self-awareness," with scores in the 99th percentile. His responses indicated additional elevated scores on clinical subscales "somatic preoccupations," "anxiety," "depression," "general somatic preoccupations," "sexual disturbance," "anxious arousal," "hyperarousal," "sexual concerns," "tension reduction behavior," "intrusive experiences," and "other-directedness," with scores ranging from the 86th to the 98th percentile, respectively.[19]

Mr. Paulsen's responses indicate a score in the 99th percentile for the factor, "posttraumatic stress," which is indicative of symptoms consistent with a diagnosis of posttraumatic stress disorder. His responses also indicate an elevated score for the factor, "self-disturbance," which suggests that Mr. Paulsen exhibits a disturbed or altered sense of self and others, in the 96th percentile. Additionally, his responses indicate a score in the 86th percentile for the factor "somatization," which suggests a general preoccupation with bodily concerns.

---

[16] PAI, Clinical Interpretive Report, administered 7/9/2021, p.11
[17] PAI, Clinical Interpretive Report, administered 7/9/2021, p.11
[18] PAI, Clinical Interpretive Report, administered 7/9/2021, p.12
[19] TSI-2 Score Report, administered 7/9/2021, p.3

*Forensic-Psychiatric Report*
*Michael Paulsen*

Lastly, Mr. Paulsen's responses indicate a score in the 85th percentile for the factor "externalization," which refers to the likelihood of exhibiting problematic, self-destructive, or aggressive behaviors.

The findings of Mr. Paulsen's TSI-2 are consistent with trauma-related symptoms and PTSD. The results of this assessment suggest that Mr. Paulsen is currently experiencing significant trauma-related symptomatology that is consistent with a trauma-related disorder. His scores on most of the clinical scales within this measure, including anxious arousal, hyperarousal, intrusive experiences, defensive avoidance, and dissociation are considered "clinically elevated," which is indicative of symptom endorsement that is of sufficient extremity that it represents a significant clinical concern."[20] Thus, Mr. Paulsen's results indicate that he is suffering from a multitude of trauma-related symptoms, which are likely to significantly impact his daily functioning.

## Millon Clinical Multiaxial Inventory-III (MCMI-III)

On July 19, 2021, Mr. Paulsen was administered the Millon Clinical Multiaxial Inventory-III (MCMI-III), authored by Theodore Millon, Ph.D., D.Sc., Roger Davis, Ph.D., Carrie Millon, Ph.D., & Seth Grossman, Psy.D. This is a multi-scale test of psychological functioning that assesses constructs relevant to personality and psychopathy evaluation in various contexts including psychotherapy, crisis/evaluation, and forensic assessment. The MCMI-III consists of 29 scales in total, 24 personality and clinical scales and five scales to determine how an individual approached and took the test.

According to Mr. Paulsen's profile, he displays marked dependency needs and anxiously seeks reassurance from others while intensely fearing separation from those who provide support.[21] This likely manifests in insecure and unreliable relationships, which contribute to Mr. Paulsen's irritability, moodiness, resentment, and impulsive or angry outbursts. Mr. Paulsen likely vacillates between being socially agreeable and sullenly withdrawn, which may keep others on edge. Moreover, Mr. Paulsen often anticipates that his relationships will be troublesome. As a result, he tends to "test" the behavior of others in order to determine the genuineness of their interest in him, which often alienates those around him.[22] However, when threatened by separation or disapproval, Mr. Paulsen may express guilt and self-condemnation in the hope of regaining support and sympathy. This constant fluctuation indicates difficulty with regulating his emotional controls and may contribute to a persistent state of tension and depression.[23]

Mr. Paulsen's profile also suggests that while he may find gratification in displaying intentionally contrary and oppositional behavior at times, he is typically submissive and cooperative. He is inclined to subordinate his own wishes to those of others, resulting in the

---

[20] TSI-2 Manual
[21] MCMI-III Interpretive Report, dated 7/19/2021, p.6
[22] MCMI-III Interpretive Report, dated 7/19/2021, p.6
[23] MCMI-III Interpretive Report, dated 7/19/2021, p.6

*Forensic-Psychiatric Report*
*Michael Paulsen*

habit of being conciliatory, deferential, and self-sacrificing. Further, he tends to believe that it is best to "place his fate in others' hands" and views other people as "much better equipped" to navigate the intricacies of a complex world.[24]

Mr. Paulsen's responses indicate that he is experiencing an acute major depression that is probably characterized by agitation and erratic qualities.[25] He may also experience periods of self-loathing interspersed with momentary acts of defiance, which he may feel unable to control. This further suggests that he is subject to manic episodes, as well, characterized by restlessness, distractibility, hostility, and interpersonal disruption. Further, Mr. Paulsen's responses suggest that he is currently experiencing clinical signs of an anxiety disorder, such as fatigue, muscle tightness, edginess, and headaches, probably deriving from a feeling of being exposed to events that he cannot counteract.[26]

Mr. Paulsen's testing results suggest possible diagnoses of major depression, recurrent, severe without psychotic features; generalized anxiety disorder; and bipolar disorder, manic, severe, without psychotic features. Additionally, his personality configuration was noted to be composed of dependent personality disorder with negativistic (passive-aggressive) personality traits, self-defeating personality features, and borderline personality features.[27]

Finally, Mr. Paulsen answered items within the MCMI-III that suggest specific problem areas, including "health preoccupation," "interpersonal alienation," "emotional dyscontrol," and "self-destructive potential."[28]

## COLLATERAL INTERVIEWS

### Vincent Paulsen

On July 20, 2021, a collateral interview was conducted with Mr. Vincent Paulsen, Mr. Paulsen's half-brother, in order to gain further insight into his background and behavior. Vincent reported that he and Mr. Paulsen share the same father. According to Vincent, their father was married to his mother, Angel, before being incarcerated in Sing Sing Correctional Facility for "embezzling millions from the New York Stock Exchange" in the late 1960s. Vincent's mother divorced their father while he was in prison and he subsequently met Mr. Paulsen's mother "on the train home from Sing Sing in 1974." Vincent described their father as "a degenerate," "a schemer," "a thief," someone who "always preyed on the vulnerable," and explained that he abandoned all of his children due to being a "chronic alcoholic."

---

[24] MCMI-III Interpretive Report, dated 7/19/2021, p.7
[25] MCMI-III Interpretive Report, dated 7/19/2021, p.7
[26] MCMI-III Interpretive Report, dated 7/19/2021, p.8
[27] MCMI-III Interpretive Report, dated 7/19/2021, p.9
[28] MCMI-III Interpretive Report, dated 7/19/2021, p.8

*Forensic-Psychiatric Report*
*Michael Paulsen*

Vincent explained that he ran away from home around the age of 12 when his father began "coming around the house again." He reported that he initially wanted to live with his father, but ended up in foster care through The Jewish Board of Family and Children's Services until he was 20 years old. During that time, Vincent had no contact with his biological family. However, he began to form a relationship with Mr. Paulsen shortly after exiting the foster care system, explaining that he, along with Mr. Paulsen's other half-brothers, wanted to fill the father-figure role for Mr. Paulsen. Vincent described Mr. Paulsen as "extremely intelligent," but expressed that he was "dealt a f-cked up deck of cards." He reported that Mr. Paulsen grew up in a "500 square foot" apartment with his mother and sister and had to start working to contribute to their rent when he was only 11 years old. Additionally, Vincent referred to their father as "a piece of sh-t," although he posited that Mr. Paulsen was impacted more by his exposure to his maternal grandfather's negative influence.

According to Vincent, Mr. Paulsen's grandfather was a "typical New York Italian guy...always trying to be the gangster." He explained that Mr. Paulsen's grandfather often brought young Mr. Paulsen along with him while he conducted his illegal business ventures and collected money from his associates. Vincent suggested that this had a lasting impact on Mr. Paulsen's behavior, as he saw firsthand how one could obtain "fast money" to support one's family. Indeed, Vincent expressed the belief that Mr. Paulsen based his behavior on his grandfather's, and the instant offense was likely rooted in his desire to "be the savior, to take care of everybody." That said, Vincent felt that the instant offense likely "got out of hand," beyond what Mr. Paulsen intended.

Vincent reported that he and Mr. Paulsen have a very close relationship and regularly speak to one another on the phone. He acknowledged that Mr. Paulsen has not had an easy life, while also conceding that Mr. Paulsen made some poor choices of his own. He added that their brother, Paul is "manic bipolar," but described Mr. Paulsen as passive, introverted, and "even keeled." Still, Vincent expressed that Mr. Paulsen would likely benefit from therapy to discuss his difficult childhood and its influence on his behavior.

**Heather Cahill**

A collateral interview was conducted with Ms. Heather Cahill, Mr. Paulsen's current girlfriend, on July 21, 2021. She provided further insight into Mr. Paulsen's behavior and overall functioning. According to Ms. Cahill, she and Mr. Paulsen met at Lincoln Technical Institute when she was 18 years old. The two "dated for a bit" and were in an "on and off" relationship for the next ten years before separating until 2018. At that time, Ms. Cahill reported, they got back in touch and began dating again; the pair have been together ever since. Ms. Cahill described Mr. Paulsen as a "great person" who has become an integral part of her family over the past four years. She explained that her 10-year-old daughter Brielle's biological father passed away about three years ago, and Mr. Paulsen has been Brielle's "father figure" ever since.

*Forensic-Psychiatric Report*
*Michael Paulsen*

Ms. Cahill reported that when Mr. Paulsen talks about his childhood, he often "laughs it off," even when discussing things that are not particularly funny. For instance, Ms. Cahill reported, Mr. Paulsen told her about how his grandfather "told him to steal, even when [his grandfather] had money in his pocket," and joked that he would have to "pay the repercussions" if he didn't follow his grandfather's orders. Despite the lighthearted nature of Mr. Paulsen's recollections, Ms. Cahill noted that the negative impact of Mr. Paulsen's upbringing is evident. She stated that Mr. Paulsen's grandfather was essentially a "shylock" who taught him that "it's okay to do things wrong, it's okay to steal." She further reported that Mr. Paulsen "grew up with nothing" and likely thought, "this is how I have to survive," after witnessing his grandfather's "shady" business practices firsthand.

Notably, Ms. Cahill also reported that Mr. Paulsen appeared stressed and anxious in the months leading up to his arrest. For example, she noticed that Mr. Paulsen would switch seats with her in restaurants so that nobody would be seated behind him and so that he was always facing the door. She also noticed depressive and obsessive-compulsive symptoms in Mr. Paulsen throughout their relationship. According to Ms. Cahill, Mr. Paulsen is typically a very talkative and energetic person. However, she has noticed him "not moving from the couch" or getting dressed on some days, especially since his arrest. Additionally, she reported, Mr. Paulsen "has OCD very bad." She explained that he is extremely meticulous about cleaning and organizing his belongings, particularly his car. At times, Mr. Paulsen will reportedly "panic," pull the car over, and "start scrubbing" if he notices any imperfection. She added that he "obsessively" adjusts items in their home if he notices that they have been moved by Ms. Cahill or her daughter.

Overall, Ms. Cahill reported that Mr. Paulsen is an "honest, loyal" person who cares deeply for those around him and would "give you the shirt off his back." She expressed the belief that Mr. Paulsen may have committed the instant offense in an effort to provide his family with the "nice things" that he never had growing up and inadvertently "got in over his head." She expressed that while the circumstances surrounding his arrest are unfortunate, she and her daughter still "love him to death" and hope for the best.

## CURRENT MENTAL STATUS EXAMINATION

Mr. Paulsen is a 42-year-old Caucasian male who appeared his stated age at the time of the evaluation. He was alert and fully oriented, dressed appropriately, and well groomed. Mr. Paulsen was well-related to the examiner and very forthcoming. He maintained good eye contact throughout the examination and spoke at an appropriate rate, rhythm, and volume. His thought processes were logical and goal-oriented and there was no evidence of a thought disorder. Further, he did not exhibit any abnormal psychomotor activity, perceptual disturbances, or negative preoccupations at any time. Mr. Paulsen was a good historian and described many relevant and specific events from his upbringing. He also displayed good insight and was grossly intact cognitively. Suicidal ideation and psychotic symptoms were not reported.

*Forensic-Psychiatric Report*
*Michael Paulsen*

## DIAGNOSIS AND FORMULATION

### Bipolar II Disorder with Mixed Features
### Other Specified Trauma and Stressor Related Disorder
### Antisocial Personality Disorder Traits

Mr. Michael Paulsen is a 42-year-old Caucasian male who pled guilty to conspiring to distribute and possess with the intent to distribute oxycodone between March 2016 and September 2019. He was evaluated at the request of his attorney to gain a better understanding of his mental state at the time of the offense and any underlying psychological factors that may impact the disposition of this case.

As detailed in the body of this report, Mr. Paulsen's childhood was marked by financial difficulties, an unreliable father, an abusive grandfather, and mentors who exclusively modeled antisocial and overtly criminal behavior. Mr. Paulsen's father essentially abandoned his family when Mr. Paulsen was four years old, leaving behind a single mother who struggled to provide for her two young children on her own. Not only did his father remain an extremely inconsistent presence in Mr. Paulsen's life from that point forward, he also left Mr. Paulsen without a true father figure. Instead, Mr. Paulsen's male relatives, particularly his maternal grandfather and older half-brothers, stepped into that role and further contributed to the turbulent nature of Mr. Paulsen's formative years.

Mr. Paulsen's grandfather was reportedly an abusive, domineering man who repeatedly forced a teenaged Mr. Paulsen to steal and partake in his money lending business while threatening physical violence if Mr. Paulsen refused to comply. At the same time, he supported Mr. Paulsen's mother and helped her pay her rent each month. This, as well his brother Paul's criminal lifestyle, blurred Mr. Paulsen's appreciation of right and wrong, as he witnessed the benefits of antisocial behavior and learned that caring for one's family often means obtaining money by any means necessary. All that is to say that, at a time when he should have been developing psychological defense mechanisms, building his own psyche, and evolving into a functional and prosocial human being, Mr. Paulsen's development was instead derailed by a number of circumstances that he could not yet fully control or understand.

Mr. Paulsen currently meets Diagnostic and Statistical Manual of Mental Disorders-Fifth Edition (DSM-5) criteria for bipolar II disorder with mixed features. This is evidenced by his recurring depressive and hypomanic mood episodes, both of which are often interspersed with symptoms of mania and depression simultaneously. Mr. Paulsen endorsed experiencing numerous hypomanic symptoms, such as racing thoughts, periods of decreased need for sleep, and a history of "bouncing around" between women prior to settling down with his current girlfriend, Ms. Cahill. Further, Mr. Paulsen's involvement in high risk activities, as evidenced by the instant offense itself, is further indicative of this disorder. That said, Mr. Paulsen also endorsed depressive symptoms, such as feelings of guilt and self-loathing. Additionally, Ms. Cahill reportedly noticed periods in which Mr. Paulsen lacked energy and an

*Forensic-Psychiatric Report*
*Michael Paulsen*

interest in daily activities. The results of Mr. Paulsen's psychological testing further supported the presence of these symptoms and indicated that the constant fluctuation of his emotions likely contributes to a persistent state of depression.

According to the DSM-5, "typically, the hypomanic episodes themselves do not cause impairment" in individuals with bipolar II disorder. Instead, the impairment more often results from "a persistent pattern of unpredictable mood changes and fluctuating, unreliable interpersonal or occupational functioning."[29] This appears to be an accurate description of Mr. Paulsen. While Ms. Cahill endorsed observable hypomanic symptoms in Mr. Paulsen and characterized him as a talkative and energetic individual most of the time, his psychological testing indicated difficulties in interpersonal relationships stemming from his inconsistent social agreeability, irritability, and moodiness. Indeed, Mr. Paulsen endorsed being so "moody" at times that he feels as though he has two distinct personalities. This, in conjunction with his ongoing depressive symptoms, is consistent with the mixed nature of this disorder.

Mr. Paulsen also meets Diagnostic and Statistical Manual of Mental Disorders-Fifth Edition (DSM-5) criteria for other specified trauma and stressor related disorder. Mr. Paulsen evidences a number of symptoms characteristic of trauma or stressor-related disorders, namely hypervigilance and flashbacks, and referenced a number of significant stressors throughout his childhood. These included his father's abandonment, being abused and controlled by his grandfather, and his family's ongoing financial difficulties. As these were overarching features of Mr. Paulsen's life, a specific traumatic event is difficult to explicitly identify. However, the compounded impact of these stressors over time still induced trauma-related symptoms in Mr. Paulsen and impacted his ability to cope with future stressors. His presentation is most consistent with an adjustment-like disorder with prolonged duration of more than six months without prolonged duration of stressor.[30] In other words, Mr. Paulsen experiences marked distress and significant impairment in important areas of functioning as a result of the aforementioned stressors, despite the fact that they are no longer present in his life.

These ongoing trauma and stress-related symptoms have caused Mr. Paulsen to suffer from a more complex form of psychological trauma due to their prolonged nature at crucial points in his development. A study published in 2013 by researchers at UCLA, found that "toxic childhood stress alters neural responses to stress, boosting the emotional and physical arousal to threat, and making it more difficult for that reaction to be shut off."[31] In essence, Mr. Paulsen's chronic trauma altered his development, causing the lifelong psychological problems that he now manifests, which can best be described as antisocial personality traits.

These antisocial personality traits contributed to Mr. Paulsen's offense conduct. Through his unavoidable exposure to his grandfather's criminal lifestyle and his observation

---

[29] American Psychiatric Association. (2013). Diagnostic and statistical manual of mental disorders (5th ed.). Arlington, VA: American Psychiatric Publishing
[30] American Psychiatric Association. (2013). Diagnostic and statistical manual of mental disorders (5th ed.). Arlington, VA: American Psychiatric Publishing
[31] LaBier, D. (2013) Why the Impact of Child Abuse Extends Well Into Adulthood. *Psychology Today*

*Forensic-Psychiatric Report*
*Michael Paulsen*

of other close relatives making a living by illegal means, Mr. Paulsen inadvertently internalized this behavior and learned to function in a generally antisocial manner. This is most evident in the offense behavior itself, as Mr. Paulsen failed to conform to social norms with respect to lawful behaviors, was deceitful for personal profit, and recklessly disregarded his own safety and that of others in doing so. Additionally, Mr. Paulsen's psychological testing indicated that he anxiously fears separation and may use guilt to regain sympathy from others. This manipulation, which is a common antisocial trait, may stem from his father abandoning him, repeatedly breaking promises, and stealing from him throughout his life. Further, per his self-report and collateral sources, Mr. Paulsen's upbringing taught him that illegal activity is acceptable as long as it is done in order to provide for one's family.

That said, it is important to note that antisocial personality traits such as those evidenced by Mr. Paulsen are behaviorally based, not rooted in his actual psychopathology. In other words, it represents a set of behaviors that could be caused by a number of different factors, and thus can represent the manifestation of different sets of psychopathology, rather than something he was born with. In Mr. Paulsen's case, his "antisocial" behaviors are a product of his repeated exposure to role models who displayed antisocial behavior themselves, as well as the threats of abuse he faced if he did not follow their lead. As such, it represents a maladaptive response to trauma and learned behavior rather than an ingrained personality type. This has profound repercussions for treatment and prognosis, and it is likely that Mr. Paulsen could learn to function in a more prosocial manner with appropriate therapy and rehabilitation.

It is therefore my opinion, to a reasonable degree of medical certainty, that at the time of the offense, Mr. Paulsen's mental state was characterized by acute symptoms of bipolar II disorder, other specified trauma and stressor related disorder, and features of an antisocial personality, which in turn significantly impacted on his thinking and judgement during the offense conduct. It is my professional opinion that these factors warrant consideration as mitigating factors in reaching an appropriate disposition of his criminal charges.

Respectfully submitted,

**Alexander Sasha Bardey, M.D.**
**FIFTH AVENUE FORENSICS**
Diplomate in Psychiatry, American Board of Psychiatry and Neurology
Diplomate in Forensic Psychiatry, American Board of Psychiatry and Neurology
Clinical Faculty, Department of Psychiatry, New York University Medical Center
Adjunct Assistant Professor, Department of Psychiatry and Behavioral Sciences
New York Medical College