

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 3, 2021

**BY ECF**

The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

  Re: *United States v. Michael Paulsen*, 19 Cr. 660 (PAC)

Dear Judge Crotty:

  The Government respectfully submits this letter in advance of defendant Michael Paulsen's sentencing, scheduled for September 9, 2021.  On March 23, 2021, the defendant pled guilty to one count of conspiring to distribute and possess with the intent to distribute oxycodone, in violation of Title 21, United States Code, Sections 841(b)(1)(C) and 846.   The defendant owned and operated a pharmacy which he used to divert large quantities of oxycodone for resale, funneling pills onto the streets of his local neighborhood and to addicted users.  He enlisted others into his scheme—directing that certain individuals provide him with fraudulent prescriptions and that others assist him in filling out the prescriptions despite not having the necessary authority as pharmacists.  He did so for his own financial gain and to evade detection by law enforcement. The Government respectfully submits, for the reasons set forth below, that a sentence within the applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range should be imposed in this case.

**I.  Offense Conduct**

  In 2018, the Drug Enforcement Administration ("DEA") and New York City Police Department ("NYPD") began investigating the defendant's unlawful diversion of tens of thousands of oxycodone pills.  (*See* Pre-Sentence Report, dated June 3, 2021 ("PSR") ¶ 10).  At the time, the defendant owned and operated a pharmacy (the "Pharmacy") in Staten Island, New York which he used to illegally sell the oxycodone pills.

  The distribution of oxycodone, a highly addictive, narcotic-strength opioid used to treat severe and chronic pain conditions, is heavily regulated.  Prescriptions for oxycodone cannot exceed a 30-day supply and cannot allow for "refills." A patient who has exhausted their initial prescription must see a treating physician again each month and be re-evaluated before obtaining a new prescription from the doctor.  To curb any potential for abuse, pharmacies are required to track and report all prescriptions filled for oxycodone, and by law, no patient is supposed to be

September 3, 2021
Page 2

able to fill a prescription for oxycodone more than once every 30 days, even if written by a different doctor.

In part because they are so highly addictive and heavily regulated, the ability to fill oxycodone prescriptions and supply oxycodone pills has enormous value to drug dealers. Oxycodone prescriptions can be filled at virtually any pharmacy and the oxycodone tablets can then be resold on the street for thousands of dollars. Thirty-milligram oxycodone pills, which are popular among street-level drug dealers, have a street value of approximately $30 per pill in New York City, with prices ranging even higher in other parts of the country. A single thirty-day prescription for 180 thirty-milligram pills of oxycodone could net a street-level dealer in New York City $5,400 in cash or more.

At the time of the investigation in this case, the Pharmacy was receiving oxycodone pills and was supplied by the Rochester Drug Co-Operative Inc. ("RDC"), a wholesale distributor of pharmaceutical products. (*Id.* ¶¶ 13-14). In April 2019, several months before the defendant was charged in this scheme, RDC entered a deferred prosecution agreement with the Government upon admitting that between January 2012 and March 2017 it had "distributed controlled substances to pharmacies that it knew were dispensing controlled substances for illegitimate purposes, and to pharmacies that it should reasonably have known and intentionally avoided confirming were dispensing controlled substances for illegitimate purposes." *United States v. Rochester Drug Co-Operative*, 19 Cr. 290 (NRB) (S.D.N.Y. Apr. 23, 2019), ECF No. 5 (Deferred Prosecution Agreement), Ex. C ¶ 4. RDC distributed controlled substances to pharmacies even after identifying "red flags" of diversion and frequently brought on pharmacy customers that had been terminated by other distributors. (PSR ¶ 14).

Over the course of more than three years, from the time that he opened the pharmacy in March 2016 up until August 2019, the defendant ordered more than 170,000 oxycodone pills from pharmaceutical suppliers. The defendant recorded that he only dispensed approximately 62,000—or slightly more than one-third—of the oxycodone pills to customers who had a prescription. The defendant distributed the remaining amount—approximately 108,000 oxycodone pills—to the Pharmacy's customers who either did not have a prescription or had a fraudulent prescription. The defendant knew that many of the individuals to whom he was selling the oxycodone pills had no legitimate medical need for oxycodone and instead intended to resell at least a portion of those pills in street-level sales to pay off their mortgages and other bills. (*Id.* ¶¶ 14-17).

During this period, the defendant himself was not a registered pharmacist authorized to dispense controlled substances in New York State. The defendant had a pharmacist on staff in name only and at least one additional low-level employee. The defendant forged the pharmacist's signature and utilized the pharmacist's identity to secure oxycodone pills. In May 2019, when the defendant believed that the Pharmacy was being audited by his pharmaceutical supplier, the defendant directed at least one customer to obtain and provide the defendant with fraudulent prescriptions for oxycodone in an attempt to ensure that the defendant's illegal activities would not be detected. (*Id.* ¶¶ 14-19).

September 3, 2021
Page 3

On September 12, 2019, the defendant was charged in an indictment (the "Indictment") with three counts: (1) from March 2016 through September 2019, conspiring to distribute and dispense and possess with the intent to distribute and dispense outside the scope of professional practice and not for a legitimate medical purposes, mixtures and substances containing a detectable amount of oxycodone, in violation of 21 U.S.C. §§ 841(b)(1)(C) and 846 (Count One); (2) from April 2019 through July 2019, executing a scheme to defraud a health care benefit program and obtain, by means of false and fraudulent pretenses, money and property owned by a health care benefit program, in violation of 18 U.S.C. § 1347 (Count Two); and (3) from April 2019 through July 2019, filling fraudulent and medically unnecessary prescriptions for oxycodone and other substances, obtaining reimbursement from health insurance plans, including Medicaid and Medicare, which were transferred through offices in Manhattan, New York for the substances dispensed to the beneficiaries, and paying "kickbacks" to the beneficiaries to induce them to obtain substances from the Pharmacy, in violation of 42 U.S.C. § 1320a-7b(b)(2)(B) (Count Three).

## II.    The Defendant's Plea and Applicable Guidelines Range

On March 23, 2021, the defendant pled guilty, pursuant to a plea agreement, to Count One of the Indictment.  (*Id.* ¶ 4).  The parties' plea agreement stipulated that the defendant's base offense level was 34 and that a two-level enhancement applied because the defendant abused a position of trust or used a special skill, as the owner and operator of a pharmacy.  The parties further agreed that, if the defendant clearly demonstrated acceptance of responsibility, the defendant would qualify for an additional three-level reduction, resulting in a total offense level of 33.  The plea agreement also stipulated that the defendant was in Criminal History Category I and that, as a result, his applicable Guidelines range was 135 to 168 months' imprisonment (the "Guidelines Range").  (*Id.* ¶ 7).

On July 9, 2021, the Probation Office issued its final Presentence Report, which noted that the defendant's total offense level should include an additional two-level reduction because the defendant met the criteria set forth in Section 5C1.2(a)(1)-(5) of the United States Sentencing Guidelines.  The Government has confirmed that the defendant is eligible for the two-level reduction, which would result in a total offense level of 31 and a resulting Guidelines range of 108 to 135 months' imprisonment.[1]  (*Id.* ¶ 89).  The Probation Office recommends that the defendant be sentenced to 48 months' imprisonment.  (*Id.* at 23).

## III.    Applicable Law

Although *United States v. Booker*, 543 U.S. 220, 264 (2005), held that the Guidelines are no longer mandatory, it also held that district courts must "consult" the Guidelines and "take them into account" when sentencing.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

---

[1] The Government nonetheless stands by its agreement to a stipulated Guidelines range of 135 to 168 months' incarceration.

September 3, 2021
Page 4

After performing that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the four legitimate purposes of sentencing, as set forth below, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statement by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and (7) "the need to provide restitution to any victims."   18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18  U.S.C. § 3553(a)(2).

## IV.   Discussion

A sentence within the Guidelines range is appropriate in this case to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to this defendant and other similarly situated individuals, and to protect the public from further crimes of the defendant.  *See* 18 U.S.C. § 3553(a)(2)(A)-(C).

*First,* a sentence within the Guidelines Range is appropriate in light of the seriousness of the instant offense.  *See* 18 U.S.C. § 3553(a)(2)(A).  The defendant owned and operated a pharmacy that he used for illegitimate means.  He abused that role to unlawfully divert thousands of oxycodone pills to individuals who were desperate to feed their addictions or to pay their bills. These were not isolated incidents; they occurred over more than three years.  The defendant had ample time to reflect on his conduct and instead made a conscious decision day in and day out to use his pharmacy for illicit purposes in order to make some additional money.  And the defendant played a crucial role in this scheme: he forged the pharmacist's signature on documents, had access to the supplies of oxycodone, directed individuals about how they could obtain that oxycodone by getting fraudulent prescriptions, and took steps to try to conceal his activity from law enforcement by having prescriptions that he would enter into his database despite knowing that they were fraudulent.

4

September 3, 2021
Page 5

    *Second*, a sentence in the Guidelines Range is necessary to afford adequate deterrence and protect the public from future crimes committed by the defendant.  *See* 18 U.S.C. § 3553(a)(2)(B), (C).  The defendant conspired to sell a very dangerous and highly addictive substance.  Oxycodone addiction is an epidemic sweeping this country.  The defendant operated the Pharmacy with a federal license to distribute controlled substances and repeatedly violated regulations as the owner of the Pharmacy and functioned as a pharmacist for the customers even though he was not a licensed pharmacist.  A significant sentence is necessary to send a clear message to others who would consider distributing oxycodone that such destructive conduct, which threatens lives every time it is unlawfully sold, will be met with very serious consequences.

    *Third*, the defendant's history and characteristics militate in favor of a Guidelines sentence.  It bears emphasis:  the defendant fraudulently held himself out to others as a pharmacist, using his position of trust to distribute thousands of highly addictive and deadly drugs.  He assumed responsibilities to serve his community.  The defendant undermined those responsibilities through his conduct here.  The testaments to the defendant's character, as set forth in the defense submission (*see* Def. Submission Ex. C), highlight many positive traits, but they also demonstrate a plain truth: the public and the defendant's family deserved more from a man of the defendant's potential.  The defendant may be a first-time offender whose record reflects no previous misconduct, but the Guidelines take this into account when calibrating the level of punishment applicable to first-time offenders.  More than a history of law-abiding behavior is required to support a variance from the Guidelines range of the sort sought by the defendant.[2]

    *Fourth*, the Government acknowledges that the defendant should be credited for his early acceptance of responsibility and willingness to proffer with the Government.  But the applicable Guidelines range already accounts for these factors by downwardly adjusting the defendant's total offense level by five levels.  (PSR ¶¶ 31, 37-38).  It is inaccurate, moreover, for the defendant to suggest that the Government's knowledge of the quantity of oxycodone distributed by the defendant "stems *not* from the government's prior investigation of [the defendant] but from his estimates of oxycodone illegally dispensed as set forth in proffer sessions."  (Def. Submission at 4 (emphasis added)).  To the contrary, the Government agreed to stipulate that the defendant conspired to illegally distribute a quantity of oxycodone that was no more than what the defendant had already admitted to conspiring to distribute during proffers.  Prior to the defendant ever having met with the Government, the Government had already investigated his conduct through surveillance, controlled buys, judicially authorized interceptions of communications, relying on

_____

[2] The defendant notes that certain aggravating factors do not exist in this case.  (*See* Def. Submission at 9).  But the Guidelines range already takes into account that fact, including that there were no "firearms, or violence of any kind" involved in the offense or death resulting from the defendant's distribution of controlled substances.  *See, e.g.*, U.S.S.G. § 2D1.1(a)(1) (base level offense for offense of conviction establishing that death or serious injury resulted); § 2D1.1(b)(1) (use of a dangerous weapon); § § 2D1.1(b)(2) (use of violence or threats of violence).  Put differently, the absence of these factors does not render this case "apart from the heartland" but squarely within it. The presence of those factors would only be cause for the Guidelines and the Court to treat this case as above and beyond the heartland.

September 3, 2021
Page 6

confidential sources, and a host of other investigative techniques.  The Government therefore already had identified a quantity of oxycodone that the defendant had agreed to distribute illegally. It is simply not the case that "*in a sense*, Mr. Paulsen's effort . . . to cooperate with the government worked to his great disadvantage."  (Def. Submission at 4 (emphasis added).)  There is, instead, "no" sense in which the defendant's effort to cooperate disadvantaged him at sentencing.[3]

In sum, the defendant used his pharmacy to profit from illegal narcotics sales. He abused his position of trust and played an essential role in diverting thousands of addictive oxycodone pills, fully aware that they were destined for re-sale. Without the defendant, the conspiracy would have been lacking in its essential element—the oxycodone it distributed. For that, the defendant should receive a sentence within the applicable Guidelines Range.

V.      **Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines Range.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By:___/s/_____
Elinor L. Tarlow / Daniel Wolf
Assistant United States Attorney
(212) 637-1036

cc:     Defense counsel (by ECF)

---

[3] In connection with the defendant's proffers, the defendant states that "[a]t no time did the government believe that he lied, misstated relevant or material facts or omitted such facts."  (Def. Submission at 4).  To date, the Government has never taken such a comprehensive position—and takes no position here—as to the defendant's veracity.  The Government instead has maintained that even if the information proffered by the defendant were true, it could not ever put the defendant in a position to offer "substantial assistance" to the Government.